<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    )      Docket No. 12 CR 50027
                                  )
 4                  Plaintiff,    )      Rockford, Illinois
                                  )      Thursday, February 14, 2013
 5             v.                 )      9:00 o'clock a.m
                                  )
 6   RITA CRUNDWELL,              )
                                  )
 7                  Defendant.    )

 8                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE PHILIP G. REINHARD
 9
     APPEARANCES:
10
     For the Government:          HON. GARY S. SHAPIRO
11                                Acting United States Attorney
                                  (327 S. Church Street,
12                                 Rockford, IL  61101) by
                                  MR. JOSEPH C. PEDERSEN
13                                MR. SCOTT R. PACCAGNINI
                                  Assistant U.S. Attorneys
14
     For the Defendant:           MR. PAUL E. GAZIANO
15                                MS. KRISTIN J. CARPENTER
                                  Federal Defender Program
16                                (202 W State Street,
                                   Suite 600,
17                                 Rockford, IL  61101)

18   Also Present:                MR. PATRICK GARRY
                                  Special Agent, FBI
19
                                  MS. JENNIFER TABORSKI
20                                Probation Office

21                                MR. BRADLEY STALLINGS
                                  Investigator
22
     Court Reporter:              Mary T. Lindbloom
23                                327 S. Church Street
                                  Rockford, Illinois  61101
24                                (815) 987-4486

25
</pre>

1    THE COURT:  Before I call the case, let me sort out

2  through some materials before I address the attorneys.

3    (Brief pause.)

4    THE COURT:  All right.  You can call the case.

5    THE CLERK:  12 CR 50027, U.S.A. v. Rita Crundwell.

6    THE COURT:  Do you want to approach the bench, please,

7  Mr. Gaziano and your client?

8    MR. PEDERSEN:  Good morning, your Honor.  Joe Pedersen

9  and Scott Paccagnini on behalf of the United States.

10    THE COURT:  Good morning.

11    MR. GAZIANO:  Good morning, your Honor.  Paul Gaziano

12  and Kris Carpenter of the Federal Defender Program on behalf of

13  Ms. Crundwell, who stands to my right.

14    THE COURT:  Good morning to both of you.  This case is

15  set for sentencing hearing.  Are you ready to proceed at this

16  time?

17    MR. PEDERSEN:  Yes, your Honor.

18    MR. GAZIANO:  Yes, your Honor.

19    THE COURT:  Before asking some questions of the

20  defendant, I want to go over all the materials that I have that

21  both sides have provided to me so that I can be sure that I have

22  everything that you intend that I should be considering.  So,

23  I'm going to go through this.

24    I have the presentence investigation report.  I have

25  various supplemental reports by the probation office.  These are

1    all letters that are either in support of the defendant at

2    sentencing or in opposition to the defendant at sentencing.  And

3    I'm not going to go over each and every letter.  I'm just going

4    to indicate that there are multiple letters that are attached to

5    these various supplemental reports.

6            I have a supplemental report that is dated January 24.

7    I have one that is dated February 7.  It looks like another one

8    on February 7 labeled second supplemental.  February 13.

9    Another one February 13.  I've read all those.

10           Then I have the United States' motion for an upward

11   variance with various exhibits attached.  I have the response by

12   the defendant to the government's sentencing memorandum and the

13   defendant's sentencing memorandum  Then I have the United

14   States' response to that.  I have a motion of the United States

15   for entry of a preliminary order of forfeiture.  And I have an

16   agreed stipulation relating to disposition of property.

17           Then in the last -- I guess this was just filed on the

18   12th.  I have the United States' notice of intent to present

19   evidence in aggravation and victims' intent to allocute at

20   sentencing.  And that's accompanied by -- well, I'm sorry.  With

21   that is this document that was filed, a multi-page list of

22   exhibits that would be offered at sentencing.

23           MR. PEDERSEN:  Right.  Those weren't filed.

24           THE COURT:  They weren't filed.  They were --

25           MR. PEDERSEN:  Provided to you with the consent of

1    defense counsel in advance of the hearing.

2          THE COURT:  All right.  And then I have the federal

3    defender's submission of two stipulations.  And then I have a

4    letter with attachments of information that I requested as to

5    bank accounts that are at issue here.  During the course of my

6    review of the case for sentencing, I wanted to see certain

7    documents.  As you're aware, I don't have any information on

8    this case until it's submitted to me by either side.

9          Now, one thing that I have a question about to the

10   government at this point, and that relates to the notice of

11   intent to present other evidence at this hearing.  Normally --

12   and it's about another bank account where you're seeking to

13   introduce evidence of money, another bank account of the city

14   that you're seeking to introduce evidence that the defendant

15   stole some moneys from that account; is that correct?

16         MR. PEDERSEN:  Yes.

17         THE COURT:  Why was that disclosed yesterday?  Why

18   wouldn't that be disclosed to the probation office either when

19   she prepared the presentence investigation report, or, if you

20   didn't have it discovered at that time, why wouldn't it have

21   been -- whenever it was discovered, I'm sure there's an FBI

22   report.  Mr. Gaziano probably got -- you would be under an

23   obligation to give it to him  Why am I getting it at the last

24   minute?  Why wouldn't that have been in the presentence

25   investigation report so that there could be an objection, if

1   there would be one?

2           MR. PEDERSEN:  Your Honor, we really did not deem that

3   information very relevant earlier, and, actually, the account

4   records were not obtained from the City of Dixon until shortly

5   before we disclosed that information.  It became relevant to us

6   at the time the defendant was claiming that she had come clean

7   completely with the FBI at the time she was arrested.  So, we

8   think it's more relevant to that argument.

9           The amount of money that was stolen, given the amount,

10  $25,000, would have no effect on the guideline range.  Also,

11  it's beyond the statute of limitations.  It's not something that

12  we could have charged.

13          THE COURT:  I understand that.  But it is relevant

14  conduct, and you're seeking to put on evidence today, and this

15  should have been disclosed -- you are aware of this prior to

16  yesterday.

17          MR. GAZIANO:  Yes, I was made aware of it prior to

18  yesterday.  Not long.

19          THE COURT:  Well, my question is we're going to spend

20  time.  You're going to put on witnesses to try to show what

21  you've set forth in this document, which, as I said, I got

22  yesterday, and we could have saved some time if this had been

23  disclosed to the probation officer and find out whether

24  Mr. Gaziano was objecting to it.

25          In other words, these are matters that should have been

1    disclosed to the court.  I don't like surprises.  Although, you

2    did give me notice yesterday.  And I'm concerned about that.  I

3    take it you knew about it at the time the presentence

4    investigation report was prepared.

5                MR. PEDERSEN:  Well, your Honor, given the amount of

6    documents that were seized from defendant's residence, these

7    were a small portion of those documents, and the agent, the case

8    agent, Patrick Garry, who's going to testify today, really had

9    not spent much time looking into it because the amount of loss

10   was so small, given the other work he was doing on the case.

11   And as I said, it only became relevant to us at the time the

12   defendant had made those statements in the defendant's response

13   to our motion for upward variance.

14                So, I apologize to the court for any inconvenience that

15   was caused by disclosing it at this time, but those were the

16   reasons for the late disclosure.

17                THE COURT:  Well, as I said, I don't like surprises,

18   and it should have been disclosed earlier.  It's not any basis

19   for a continuance, since it was disclosed at least to

20   Mr. Gaziano ahead of time.  But it's going to take time

21   unless -- time for the witnesses to testify, which maybe could

22   have been avoided.

23                In other words, is it going to be -- what's your

24   position on this?  I don't want to have a lot of witnesses who

25   testify to prove something that you may only have a limited

1    objection to or what.

2           MR. GAZIANO:  Your Honor, the only thing I would like

3    to point out with the agent, if he's going to testify, we're not

4    contesting the issue.  We never -- we've met with the FBI

5    numerous times regarding all aspects of this case.  We've had

6    proffers.  It's something that happened more than 20 years ago.

7           And they knew about it sometime, but they put it aside.

8    It could have been easily talked about in one of those proffers.

9    Do you remember this situation, and how did it happen.  We

10   didn't have that opportunity.  Now they want to bootstrap it in

11   saying that we didn't come clean.  And the only question I would

12   ask Patrick Garry would be did you ever discuss this matter with

13   Rita Crundwell during any of the proffers.

14          THE COURT:  All right.  I'll address this when we get

15   to that point in the hearing, Mr. Pedersen.  It may be that we

16   can shortcut that.

17          MR. PEDERSEN:  The only witness I intend to call

18   regarding that issue is the case agent, Patrick Garry.

19          THE COURT:  All right.  Well, you've got -- to support

20   that, it looks to me like you've got 16 exhibits, and maybe we

21   can shortcut that.

22          MR. PEDERSEN:  Well, the exhibits that apply to the

23   Sister City account are Exhibits 11 through 15.

24          THE COURT:  Okay.  The others -- actually, you're

25   right.  Some are exhibits that were attached to the presentence

1    investigation report, were they not?  Or no.  I'm sorry.  To

2    your submission.

3              MR. PEDERSEN:  Right.  One through seven you already

4    had copies of.

5              THE COURT:  Right.  Okay.  We'll get to that.

6              All right.  I've indicated what documents I have.  Is

7    there anything you think I should have that I haven't told you

8    about?

9              MR. PEDERSEN:  Not that I'm aware of.

10             MR. GAZIANO:  No.

11             THE COURT:  All right.  I'm going to address

12   Ms. Crundwell.  The presentence investigation has been prepared

13   by the probation office in this case.  I have it in my hand.  I

14   take it you have read that?

15             DEFENDANT CRUNDWELL:  Yes, your Honor.

16             THE COURT:  And gone over it with Mr. Gaziano?

17             DEFENDANT CRUNDWELL:  Yes.

18             THE COURT:  And you understand it?

19             DEFENDANT CRUNDWELL:  Yes.

20             THE COURT:  Your lawyer in response to this has not

21   filed any objection to the guideline calculation or to the

22   facts.  He's filed a sentencing memorandum that opposes the

23   government's sentencing position, and he's filed an argument

24   that I should sentence you at the low end of the guideline

25   range.  You've read that submission.

1    DEFENDANT CRUNDWELL:  Yes, sir.

2         THE COURT:  And did you -- and you agree with it?

3    DEFENDANT CRUNDWELL:  Yes, sir.

4         THE COURT:  And do you have -- after reading the

5    presentence investigation report, did you find any factual

6    matter that you disagreed with?

7    DEFENDANT CRUNDWELL:  No, sir.

8         THE COURT:  And the guidelines have been calculated.

9    Did you find any disagreement that you had with the calculation

10   of the guidelines?

11   DEFENDANT CRUNDWELL:  No, sir.

12        THE COURT:  All right.  The court will make findings

13   now as it relates to the guideline calculations and the facts.

14   I am using the November 2012 guideline manual, and I'm adopting

15   the facts as set forth in the presentence investigation report.

16   I'm also accepting the guideline calculations that are in that

17   report, and those guideline calculations are as follows.

18        The base offense level for this offense under Guideline

19   2B1.1 calls for a seven-level enhancement.  Because of the

20   amount of the loss under Guideline 2B1.1(b)(1)(M), since it's

21   between 50 million and a hundred million, there is a 24-level

22   enhancement.

23        The facts support the use of sophisticated means to

24   commit this crime, and under 2B1.1(b)(10)(C) there's a two-level

25   enhancement.  For the role in the offense, that is, an abuse of

1    position of trust, under 3B1.3 there's a two-level enhancement.

2    Therefore, the offense level is 35 when you total up all those

3    points.

4          There is a stipulated conduct of money laundering, and

5    under 2S1.1 that level is to be the same level as the offense in

6    which it underlies, and that is a 35-level enhancement.  Then

7    there are two points that are added to that if the conviction is

8    under Section 1956, and that's covered by Guideline

9    2S1.1(b)(2)(B) for that two-level enhancement.

10          Consequently, the total offense level is 37.  She has

11    accepted responsibility for the offense and has pled guilty to

12    the offense, and under 3E1.1 she receives a three-level downward

13    point from the 37, so that the total offense level is 34.

14          She has zero points, as far as her criminal history is

15    concerned.  Therefore, she falls in the best category of

16    criminal history one.  And the guideline range is 151 to 188

17    months.  Of course, the court, as counsel both knows, I can vary

18    it below that range or above that range.  The statutory maximum

19    is 240 months of imprisonment.

20          The government here does seek an upward variance, and

21    the defendant seeks a sentence of imprisonment at the low end of

22    the guideline range.  Those are my calculations.  First of all,

23    you have no objection to those calculations; is that correct?

24          MR. PEDERSEN:  No, your Honor.  No objection.

25          MR. GAZIANO:  That's correct, Judge.

1        THE COURT:  All right.  Thank you.

2        Then normally I have arguments as to sentence and give

3   the defendant a chance of allocution, but the government has

4   given me notice that they wish to call witnesses.  I'd like to

5   shortcut the witness who is going to testify as to all these

6   documents that are certain exhibits.  See what you can do in

7   getting right to the point on that.  Then you will have a number

8   of witnesses that would testify as it relates to impact on the

9   City of Dixon operations.

10       MR. PEDERSEN:  Correct.  And then the victim would like

11  to make a statement.

12       THE COURT:  In this case the victim is the City of

13  Dixon, and I'll allow you one witness to testify, and that, I

14  take it, is going to be the mayor.

15       MR. PEDERSEN:  Right.  He has a statement to read the

16  court.

17       THE COURT:  Yes.  He's going to read a statement.

18       MR. PEDERSEN:  Yes.

19       THE COURT:  There will be no cross examination of a

20  victim, as is our current practice.  You won't be having him

21  assert new facts.  He is purely going to give the impact on the

22  City of Dixon.

23       MR. PEDERSEN:  Correct.

24       THE COURT:  Also, as to those witnesses who may testify

25  as to what services, perhaps, because of her theft had to be

PDF created with pdfFactory trial version www.pdffactory.com

1    either eliminated or curtailed, let's not have a duplication of

2    all that.  I do have the other exhibit that was attached to your

3    sentencing memorandum, and, of course, that is a multi-page

4    document, and I, quite frankly, have gone through that a couple

5    of times.  So, I'm aware of what the impact is.  So, make those

6    witnesses as short as possible.

7          With that -- and if you wish, you'll be able to cross

8    examine those witnesses, if you want, Mr. Gaziano, but not the

9    mayor.  And he'll just read a statement, will he not?

10          MR. PEDERSEN:  Correct.  Your Honor, as far as the

11    exhibits that we have on our computer, once they're admitted, do

12    we need to ask permission to publish those?

13          THE COURT:  No.  Because of the unusual setup we have

14    with the other courtroom where people are in that, as I

15    understand it, the computer doesn't have its stop so we would

16    have at a trial.  So, those exhibits -- and I don't think you're

17    going to be objecting to them, are you?

18          MR. GAZIANO:  No.  I do have one question, your Honor.

19    With regard to our stipulations, I provided the court with a

20    courtesy copy.  I have the originals.

21          THE COURT:  Yes.

22          MR. GAZIANO:  May I just hand them to the court at this

23    time?

24          THE COURT:  Yes, you can do that.  And you're not going

25    to read those into the record.  You've made a record.  You may

PDF created with pdfFactory trial version www.pdffactory.com

1    refer to them in your argument or summarize them, whatever you

2    want to do.  But, yes, you may tender those.

3              MR. GAZIANO:  Thank you.

4              THE COURT:  And do you plan on any witnesses?

5              MR. GAZIANO:  No.

6              THE COURT:  All right.

7              MR. GAZIANO:  But customarily I would request that all

8    witnesses be outside of the courtroom during the testimony of

9    the other witnesses, and I'd make that motion.

10             THE COURT:  You have probably several witnesses who are

11   here.  Who is your first witness?  Is it the agent?

12             MR. PEDERSEN:  Yes.

13             THE COURT:  He can stay here, but the others, they can

14   be right outside the courtroom

15             MR. PEDERSEN:  That's fine.  And then after they

16   testify, can they remain in the courtroom?

17             THE COURT:  Yes.  And they don't have to go to your

18   office.  They can be right in the conference room

19             MR. PEDERSEN:  Your Honor --

20             THE COURT:  All right.  Before you begin your evidence

21   presentation, you were about to say something, and I have some

22   questions.

23             MR. PEDERSEN:  Okay.  As far as the exhibits then,

24   maybe to speed things up, I don't think the defense has any

25   objection to the admission of Exhibits 1 through 7.  Those were

1    the exhibits that we attached to our filing.  Is that correct?

2            THE COURT:  Any objection to those, Mr. Gaziano?

3            MR. GAZIANO:  No, your Honor.

4            MR. PEDERSEN:  I'd move to admit those.

5            THE COURT:  Thank you.  They'll be admitted.

6        (Government's Exhibits 1 through 7 were offered and received

7        in evidence.)

8            MR. PEDERSEN:  And then I've also provided the

9    remaining exhibits, 8 through 16, to Mr. Gaziano.  I don't know

10   if he has any objection to the admission of those.

11           THE COURT:  Any objection?

12           MR. GAZIANO:  No.

13           THE COURT:  Thank you, Mr. Gaziano.  Those will be

14   admitted.

15       (Government's Exhibits 8 through 16 were offered and

16       received in evidence.)

17           THE COURT:  All right.  Anything else other than a few

18   questions that I may have?

19           MR. PEDERSEN:  No, your Honor.

20           THE COURT:  I'm going to ask -- you received from me a

21   request to provide me with documents which show how this secret

22   account or the account that was an unauthorized account was

23   opened at a bank which ultimately became the Fifth Third Bank.

24   I asked you to do that so I could better understand exactly how

25   that account was opened, in whose name it was opened, and how

1    funds got into this secret account, and then how funds were

2    withdrawn by the defendant to pay for personal or her corporate

3    interests, if it was a corporation.  I don't know whether that

4    was -- was it a corporation?  Was it a sole proprietorship?

5              MR. PEDERSEN:  Limited liability company.

6              THE COURT:  Okay.  So, I asked you to provide me those

7    documents so that I could see -- and when I refer to secret

8    account, I'm saying an account that was not known to exist by

9    the City of Dixon or any of its officers, other than the

10   defendant.  That was opened by an application in the documents

11   you provided to me, and it was opened in the -- it appears that

12   the name says City of Dixon.

13             MR. PEDERSEN:  Correct, your Honor.  But that's not the

14   original signature or opening account application.  The bank no

15   longer has it.  These are the only records that they had.

16             THE COURT:  And this is -- it was a particular bank.

17             MR. PEDERSEN:  It was First Bank South.

18             THE COURT:  Was that in Dixon?

19             MR. PEDERSEN:  Yes.  They were all successor banks, and

20   then it eventually became Fifth Third.

21             THE COURT:  All right.  The document that I have that

22   you provided me is one that is for the Fifth Third Bank, and

23   it's got an account number, and it's got -- next to the account

24   number, it says RSCDA reserve fund.  That's how you have sort of

25   referred to it in your submissions to me.  And the authorized

1    person who could sign a check on that account or deal with that

2    account, the title is listed as controller/treasurer, and I see

3    the defendant's signature.  Is that how it was opened?

4              MR. PEDERSEN:  Well --

5              THE COURT:  To the bank it would appear that it is a

6    city account?

7              MR. PEDERSEN:  That was the -- I think the card you're

8    referring to is dated June 30th of 2011.  It was an update.

9              THE COURT:  That's right.

10             MR. PEDERSEN:  But that --

11             THE COURT:  But that's consistent with every --

12             MR. PEDERSEN:  Right.

13             THE COURT:  -- all of the other signature cards to the

14   best of your knowledge.

15             MR. PEDERSEN:  Yes, your Honor.  We provided additional

16   cards, one from 1997 for First Bank South and then the other one

17   that I referred to from October of 1993, and in all of those the

18   accountholder was purported to be the City of Dixon, but the

19   defendant was the only person that was authorized to sign on

20   that account.

21             THE COURT:  And I also attached to the materials that

22   you gave me, there is a document dated October 6th, 1993, and

23   it's entitled Resolution of Corporation Authorizing Officers to

24   Make Deposits and Withdrawals, and it essentially says that the

25   board of directors of the City of Dixon authorized First Bank

PDF created with pdfFactory trial version www.pdffactory.com

1     South to accept checks that would be drawn by Rita Crundwell

2     only, and it's signed by a Katie A. Swanson, secretary of the

3     board of directors.  That obviously was submitted at some point

4     to the bank.

5                    MR. PEDERSEN:  Yes, your Honor.

6                    THE COURT:  Is that a document -- have you checked?  I

7     assume you have.  Did Katie Swanson sign that, or did the

8     defendant forge that?

9                    MR. PEDERSEN:  The signature is hard to read.  It's

10    actually Kathe Swanson, K-a-t-h-e.  Special Agent Garry

11    interviewed Kathe Swanson and showed her this document.  She

12    indicated that that was her signature, but the writing on the

13    bottom, where it says for RSCDA account, was not present there

14    when she signed it, and she had no knowledge of the RSCDA

15    account.  And she, in fact, your Honor, is the person who

16    discovered -- she's the city clerk that received the bank

17    statement and then brought it to the mayor's' attention.

18                    THE COURT:  Was she a secretary to the board?  When we

19    say board of directors, it's the --

20                    MR. PEDERSEN:  She was the city clerk.

21                    THE COURT:  She was a city clerk at that time.

22                    MR. PEDERSEN:  She was the city clerk.

23                    THE COURT:  All right.  So, these are the -- at least

24    that would be how the bank assumed that this was a legitimate

25    account of the City of Dixon.

1          MR. PEDERSEN:   Correct.

2          THE COURT:   And then going on, there were other

3     accounts, quite a large number of accounts that were city

4     accounts at this ultimate bank, Fifth Third Bank; is that right?

5          MR. PEDERSEN:   Yes.

6          THE COURT:   And checks that got into -- and I'll again

7     refer to the unauthorized or secret account -- were written

8     solely by the defendant.

9          MR. PEDERSEN:   Correct.

10          THE COURT:   And they came from another fund, the

11     capital development fund.

12          MR. PEDERSEN:   Correct.

13          THE COURT:   And that was at a different bank.

14          MR. PEDERSEN:   No.   That was at Fifth Third.

15          THE COURT:   All of that was at Fifth Third, but there

16     were other accounts that -- city accounts that were at some

17     other banks, and they'd be funneled into the capital development

18     fund, too.

19          MR. PEDERSEN:   All the transfers that were made to the

20     RSCDA account came from the capital development fund, but the

21     defendant transferred various checks from other funds or wire

22     deposits into the capital development fund before the ultimate

23     transfer to the RSCDA account.

24          THE COURT:   When she made an unauthorized transfer from

25     the capital development fund, which is at the Fifth Third Bank,

1    to the secret or unauthorized account, how was this done?  It

2    was done by check.

3              MR. PEDERSEN:  Correct.  And the checks indicated

4    payable to treasurer for the most part.

5              THE COURT:  All right.  And how were those checks put

6    into the unauthorized account?  Physically?  Or would she send

7    then?  Would she physically do that or what?  If you know.  Or

8    wire transfer.

9              MR. PEDERSEN:  They were not wire transfers, but we

10   don't have the information as to how exactly the checks were

11   deposited, but we do know that she was the one that signed the

12   checks, and they were deposited into the RSCDA account.

13             THE COURT:  Would there be a deposit slip that would

14   accompany the check that would go into this secret account?

15             MR. PEDERSEN:  Yes.  And I think we attached those with

16   the submission that we gave you.  Each treasurer check payable

17   to treasurer from the City of Dixon capital development fund.

18   Below that is the deposit slip.

19             THE COURT:  All right.  Now, going on to the next step

20   in this fraud, checks then were written from the unauthorized

21   account by the defendant, and all she had to do -- and she had a

22   check that would say -- what did the check say on it that was in

23   the unauthorized account?  What was the title of it?

24             MR. PEDERSEN:  The title was the initials RSCDA and

25   then below that c/o Rita Crundwell and then P.O. Box 482, Dixon,

1  Illinois 61021.

2  THE COURT:   And you don't know whether those checks

3  were written while she was in front of a teller.

4  MR. PEDERSEN:   No, we don't know that.

5  THE COURT:   And I'm not asking you these questions.   If

6  for some reason you want to comment on that in argument.   But I

7  want to find out and I think it's important to know what this

8  transaction was or transactions were over this 20-year period.

9  That's essentially what would happen then.   She would

10  write a check, and there might be a certain amount -- some were

11  large, I see.   Some were relatively small.   What was the average

12  number of checks that would go out of that account on a monthly

13  basis?

14  MR. PEDERSEN:   Well, we attached also to our submission

15  the month of September of 2009, which was the same month as the

16  stipulated offense conduct, and I believe on that date there

17  were 17 checks written out of the account.

18  THE COURT:   And are those the ones that you attached on

19  your submission to me?

20  MR. PEDERSEN:   Yes.   We attached five samples of checks

21  that the defendant wrote either to her personal account at First

22  National Bank in Amboy or to her business RC Quarter Horses

23  account that she later opened at the First National Bank in

24  Amboy, and for all of those checks not only did they indicate

25  that they were payable to First National Bank, they also listed

1    in the pay to line the actual account number of the defendant.

2              THE COURT:  So that most of the checks -- and you only

3    gave me one month, but you've looked at everything over this

4    20-year period.  Would most of the checks have gone into one of

5    those two accounts that she had at the -- is it First National

6    Bank?  Yes, First National Bank.  Or would -- I know she also

7    had direct -- what do you call it.  Electronic --

8              MR. PEDERSEN:  Withdrawal.

9              THE COURT:  -- withdrawal that would go to Verizon or

10   Commonwealth Edison or other utilities, correct?

11             MR. PEDERSEN:  Well, and also to pay her bills.

12             THE COURT:  Credit card?

13             MR. PEDERSEN:  I mean, in the submission that we gave

14   the court, in September of 2009 there was a $67,000 approximate

15   payment to American Express.  And Special Agent Garry in the

16   summary that we provided the court went through -- and with our

17   official version, it's attached to the presentence report.  He

18   went through all the individuals who received money out of the

19   RSCDA account, and as far as dollar amount, the First National

20   Bank accounts were the highest payee, but it was eight million

21   dollars over the 20-year period to those two accounts.  So,

22   there was another 45 million that went to other payments, either

23   the direct withdrawals electronically or smaller checks that --

24   the sample that we provided the court.  So, in terms of the

25   number of checks, the majority were not to the defendant's

1    personal account, but in terms of the amount, that was the

2    majority.

3             THE COURT:  You've given me copies, and it looks like

4    there's quite a few individuals there on the samples that you

5    gave me.

6             MR. PEDERSEN:  Yes.

7             THE COURT:  In the FBI agent going through those, was

8    it determined whether a lot of those people were local?

9             MR. PEDERSEN:  Most -- well, virtually all the expenses

10   that the defendant paid with checks were for either her business

11   or her personal electricity bill, phone bill, things like that.

12   And I could ask the agent specifically, but that's my

13   understanding, that most of the checks that were written would

14   have been for local, but the --

15            THE COURT:  A local person who might work for her or

16   might be a supplier for her horse breeding business.

17            MR. PEDERSEN:  Correct.  Or in the sample that we

18   provided, there's a check that she wrote to the American Quarter

19   Horse Association for fees.  But many of them also are suppliers

20   for either the ranch that she operated with the horses or her

21   own operation at her residence.

22            THE COURT:  All right.  There were monthly statements

23   that the bank would have prepared that reflect all these checks

24   that she would have gotten a copy of.

25            MR. PEDERSEN:  Correct.

1        THE COURT:  And that ultimately -- well, ultimately, it

2   was discovered -- this account was discovered, is that correct,

3   by the city clerk?

4        MR. PEDERSEN:  Yes.

5        THE COURT:  When she was substituting when the

6   defendant was not there.

7        MR. PEDERSEN:  Right.

8        THE COURT:  That's essentially the scheme; is that

9   correct?

10        MR. PEDERSEN:  That's correct, your Honor.

11        THE COURT:  All right.  I'm ready to proceed with

12   whatever evidence the government has to offer.  You and your

13   client may be seated.

14        MR. GAZIANO:  Thank you.

15        THE COURT:  If you have questions of cross examination,

16   then I'd ask that you approach the podium, Mr. Gaziano.

17        MR. GAZIANO:  Thank you.

18        THE COURT:  All right.  Go ahead, Mr. Pedersen.  Call

19   your first witness.

20        MR. PEDERSEN:  Call Special Agent Patrick Garry.

21        THE COURT:  Step forward, please.  Raise your right

22   hand.

23      (Witness duly sworn.)

24        THE COURT:  Be seated.  Speak into the microphone.  And

25   again, Mr. Pedersen, let's make this as brief as possible.

Garry - Direct

1        PATRICK GARRY, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. PEDERSEN:

4    Q.   Could you state your name and spell your last name, please?

5    A.   Patrick Garry, G-a-r-r-y.

6    Q.   And how are you employed?

7    A.   I'm a special agent with the FBI.

8    Q.   How long have you been a special agent?

9    A.   Approximately seven years.

10   Q.   And what are you assigned to do?

11   A.   I'm assigned in the Rockford RA.  I investigate crimes

12   related to public corruption.

13   Q.   Were you assigned to the investigation of Rita Crundwell?

14   A.   Yes.

15   Q.   Are you familiar with that individual?

16   A.   Yes, I am

17   Q.   Do you see her in the courtroom today?

18   A.   I do.

19   Q.   Could you point to her and identify her by something that

20   she's wearing?

21   A.   Ms. Crundwell is seated at the defense table.  She's wearing

22   a white sweater.

23         MR. PEDERSEN:  I'd ask that the record reflect

24   identification of the defendant.

25         THE COURT:  It may.  Go ahead.

Garry - Direct

1  BY MR. PEDERSEN:

2  Q.  Special Agent Garry, I wanted to show you real briefly

3  Government's Exhibits 1 through 5.

4         MR. PEDERSEN:  May I approach the witness, your Honor?

5         THE COURT:  Yes.  All those exhibits have been

6  admitted.

7  BY MR. PEDERSEN:

8  Q.  Regarding Exhibits 1 through 5, you prepared those; is that

9  correct?

10  A.  That's correct.

11  Q.  They're all summaries of the numerous records that you

12  reviewed in relation to the scheme to defraud the City of Dixon?

13  A.  That's correct.

14  Q.  And some of the records you reviewed were records that you

15  obtained from Fifth Third Bank that were obtained through

16  subpoena?

17  A.  Yes.

18  Q.  And then the other records -- the records that you obtained

19  from Fifth Third Bank only went back to 2005, correct?

20  A.  That's correct.

21  Q.  The remaining records, were those records that you seized

22  from the defendant's residence on April 17th of 2012?

23  A.  That's correct.

24  Q.  And those records went all the way back to when the account

25  was opened back in 1990?

Garry - Direct

1  A.  That's correct.

2  Q.  Were there any records that you weren't able to locate

3  during that time period from 1990 to 2005?

4  A.  Yes.  There were some missing statements that we didn't find

5  at her residence.

6  Q.  And what time period are you missing approximately?

7  A.  We're missing bank account information from November of '95,

8  all of 1996, and January through March of 1997.

9  Q.  And as part of the investigation, did you also during the

10  search of the defendant's desk at the city hall in Dixon,

11  Illinois, locate some invoices that were purportedly from the

12  State of Illinois?

13  A.  Yes.

14  Q.  I'm going to show you what's been marked as Government's

15  Exhibit 8.  Do you recognize that?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  These are the 159 fake invoices that Rita Crundwell created

19  to support transfers out of the capital development fund.  We

20  found these during our search of city hall on the 17th of April.

21  Q.  And do each one of those invoices correspond to an equal

22  amount of money that the defendant took from the City of Dixon

23  around the date of those invoices?

24  A.  Yes.

25  Q.  I'm going to show you Government's Exhibit 6.  Can you see

Garry - Direct

1    that?

2    A.   Yes.

3    Q.   That's one of the invoices that is included in Government's

4    Exhibit 8; is that correct?

5    A.   That's correct.

6    Q.   And the invoice indicates that the invoice was for sewer

7    separation and relocation; is that right?

8    A.   That's right.

9    Q.   Was that work ever actually done by the State of Illinois

10   for the City of Dixon?

11   A.   No.

12   Q.   Okay.  And based on your investigation, did you determine

13   that the other 158 invoices indicated similar work that was not

14   done, as well?

15   A.   Each invoice had a location of where the work would have

16   been done.  I didn't verify with the city whether each

17   individual -- whether there was work done at any of those

18   invoices, but I do know that the actual dollar amount went from

19   the capital development fund to the defendant's RSCDA account

20   and was used for her personal expenses and was not paid to the

21   State of Illinois.

22   Q.   Okay.  I want to move on to your interview of the defendant

23   on April 17th of 2012.  Did you have occasion to go to the city

24   hall in Dixon, Illinois, on April 17th of 2012?

25   A.   Yes.

Garry - Direct

1  Q.   And did you speak with the defendant at that time in the
2  mayor's office?
3  A.   Yes.   Myself and another agent, Agent Cain, spoke with the
4  defendant at that time.
5  Q.   Before you asked the defendant any questions, did you tell
6  her what information or some of the information you had learned
7  during the investigation?
8  A.   Yes, I did.
9  Q.   What did you tell the defendant before you asked her any
10  questions?
11  A.   I told her that we knew that she had been taking money from
12  the City of Dixon, that we had reviewed all of the bank records,
13  that the bank records showed exactly what happened and how much
14  was gone and the time frame that she took the money.   I also
15  explained to the defendant that it was not really a question of
16  if she had taken the money, but rather why she had taken the
17  money and that this was her opportunity to explain her side of
18  the story.
19  Q.   And during the course of the interview, did you also show
20  the defendant some of the bank statements that were obtained
21  from the RSCDA account?
22  A.   I did.   I showed her a bank statement from 2007.
23  Q.   And during the course of the interview, did the defendant
24  admit that she had used the RSCDA account to take money from the
25  City of Dixon?

Garry - Direct

1    A.   Yes, she did.

2    Q.   Did she also sign a written statement?

3    A.   Yes, she did.

4    Q.   I'm going to show you what's been marked as Government's

5    Exhibit 9.   Is that the first page of the two-page statement?

6    A.   It is.

7    Q.   And then is that Page 2?

8    A.   Yes, it is.

9    Q.   And the statement was signed by the defendant, correct?

10   A.   Correct.

11   Q.   And you signed it, as well.

12   A.   Yes.

13   Q.   And during the course of the interview and in that written

14   statement, did the defendant indicate how much money that she

15   believes that she had taken from the City of Dixon during the

16   course of her scheme?

17   A.   Yes.   The defendant indicated that she could have taken ten

18   million dollars from the City of Dixon during that time, but she

19   also acknowledged that she could have taken more than that

20   amount.

21   Q.   And did she tell you when she thought she had started the

22   scheme?

23   A.   The defendant thought she started the scheme in 1999 or

24   2000, and she also said that she remembers because she needed

25   the money to purchase a horse named Sheza Telusive Kid.

PDF created with pdfFactory trial version www.pdffactory.com

Garry - Direct

1    Q.   And as part of the investigation, did you learn when the
2    defendant purchased Sheza Telusive Kid?
3    A.   Yes.   The defendant actually purchased Sheza Telusive Kid in
4    April of 2001, approximately twelve years after she had started
5    taking money from the City of Dixon.
6    Q.   Did the defendant say anything else about when she said she
7    thought she started the scheme?
8    A.   Yes.   The defendant also indicated that she started the
9    scheme -- she knew when she started the scheme because that was
10   when she had opened the RSCDA account.
11   Q.   And when was that account opened?
12   A.   That account was actually opened in December of 1990.
13   Q.   Now I want to ask you some questions regarding Government's
14   Exhibits 11 through 15.   They've already been admitted.   So,
15   just to be clear, Government's Exhibit 11, are those the records
16   of the Sister City account that were seized from the defendant's
17   house?
18   A.   Yes.
19   Q.   And could you explain to the court, based on your
20   investigation, what you learned about the Sister City account at
21   the City of Dixon?
22            THE COURT:   And when you learned it.
23   BY THE WITNESS:
24   A.   Right.   I knew about the Sister City account shortly after
25   the search of Crundwell's residence in April of 2012.   The

Garry - Direct

1  account was set up by the city to promote their -- or to support

2  their program that promotes cultural ties between the City of

3  Dixon and other sister cities in Germany, Africa, Ireland, and

4  Siberia.

5  BY MR. PEDERSEN:

6  Q.   And why did an account have to be established for that

7  purpose?

8  A.   They had certain expenses that they would use that account

9  to pay for, such as travel, delegates, to pay for souvenirs, or

10  to reimburse host families for expenses related to this program

11  with Sister City.

12  Q.   And you said that you learned about the account shortly

13  after the defendant's arrest.  Were there some bank records and

14  documents related to that account that were seized from

15  defendant's residence on April 17th of 2012?

16  A.   Yes.

17  Q.   And did you have an idea any dollar amount of the potential

18  loss, if any, at that time?

19  A.   I knew the loss was relatively small, that we had very

20  incomplete records that we obtained from her house.  We only had

21  approximately six months' worth of records and very few checks.

22  Q.   And in preparation for the sentencing hearing, did you

23  decide very recently to go through those records again?

24  A.   Yes.

25  Q.   Okay.  And did you also then obtain records from the City of

PDF created with pdfFactory trial version www.pdffactory.com

Garry - Direct

1    Dixon relating to that account, as well?

2    A.   I did.

3    Q.   And those records, are they contained in Government's

4    Exhibit 13?

5    A.   Yes.

6    Q.   And do those records contain some bank statements, some

7    canceled checks, a check register, cash receipts, and cash

8    disbursement ledgers?

9    A.   They do.

10   Q.   And as far as your review of those records, are those

11   records incomplete?

12   A.   They are.  They're missing some statements.  Some of the

13   statements were found at the defendant's home, but they're also

14   missing a number of checks for the statements they do have.

15   Q.   Well, how many checks did you find at the defendant's

16   residence?

17   A.   Approximately 33 checks that did not relate to City of

18   Dixon.

19   Q.   What did the checks relate to?

20   A.   The checks related to personal expenses of the defendant.

21   Q.   And what was the total amount of those expenses?

22   A.   The total amount was $25,322.34.

23   Q.   And you provided that in Government's Exhibit 15, the

24   summary that you prepared?

25   A.   Yes.

**Garry - Direct**

1  Q.  Okay.  And you were able to determine that the expenses

2  related to the defendant by looking at the checks, and also did

3  one of -- was there a check to American Express that had an

4  account number on it?

5  A.  Yes, there was a check to American Express that had an

6  account number.  The account number I know is the defendant's

7  because it was also contained on a credit report that she had

8  used and used that account number for her personal benefit.

9  Q.  Okay.  And the check register, that's included in

10  Government's Exhibit 14, which is a smaller sample of the

11  records from Government's Exhibit 13; is that right?

12  A.  That's right.

13  Q.  And between August of 1988 and April of 1990, were there

14  approximately 302 checks, according to that check register,

15  written on the account?

16  A.  Right.  It's between May of 1988 and April of 1990.

17  Q.  And how many checks are missing from the number sequence?

18  A.  Out of the sequence up to check 302, there were 205 missing

19  checks.

20  Q.  And were any of those missing checks the same ones that were

21  found at the defendant's residence?

22  A.  Yes.  I found 33 of the 205 missing checks at the

23  defendant's residence.

24  Q.  And the other 172 checks are unaccounted for?

25  A.  Correct.

Garry - Direct

1  Q.   And are there any bank records available that you could

2  obtain at this time?

3  A.   No.   The bank didn't retain records from that far back.

4  Q.   Okay.   And at that time when the search was completed, you

5  had these incomplete records.   So, you don't have statements for

6  many of the months; is that right?

7  A.   Not for very many of the months.   We're missing a lot of

8  bank statements.

9  Q.   So, you don't know what, if any, deposits that the defendant

10  made back into the account?

11  A.   No.   Just based on the check register that the city kept and

12  the cash receipts ledger they kept, the city kept a record of

13  what they thought was going in and out of the account.

14  Q.   And you didn't find any other evidence of any money going to

15  the defendant after the dates that you have in the summary; is

16  that right?

17  A.   Any records going to the defendant other than those 33

18  checks from the bank account?

19  Q.   Right.

20  A.   No.

21       MR. PEDERSEN:   That's all the questions I have for

22  Special Agent Garry, your Honor.

23       THE COURT:   I'll let you examine, Mr. Gaziano.

24       I have one question.   Was that account closed?

25       THE WITNESS:   Yes.   It was dormant for awhile after the

Garry - Cross

1    RCA account was created, and it was eventually finally closed

2    out in August of 1988.

3              THE COURT:   You may examine.

4              MR. GAZIANO:   Thank you, your Honor.

5                        CROSS EXAMINATION

6    BY MR. GAZIANO:

7    Q.   I want to call your attention to April 17th, 2012.  That is

8    the first date that you met Ms. Crundwell; is that correct?

9    A.   That's correct.

10   Q.   By that time you had been investigating this matter for

11   several months; is that correct?

12   A.   I don't know that it had been several months.  We first got

13   subpoena records back in late February, early March.

14   Q.   Okay.  So, you had been involved with the case for a month

15   or two?

16   A.   For awhile, yes.

17   Q.   And you were the case agent from the beginning?

18   A.   Yes.

19   Q.   When you met with Ms. Crundwell, you were armed with an

20   arrest warrant; is that correct?

21   A.   That's correct.

22   Q.   The initial conversation occurred in the mayor's office, and

23   only present were you and Agent Cain?

24   A.   That's correct.

25   Q.   The mayor was there initially, but he left?

Garry - Cross

1    A.   That's correct.

2    Q.   Now, Ms. Crundwell was asked in part when did she begin

3    stealing the money; is that correct?

4    A.   That's correct.

5    Q.   And she told you at one point, "When I opened the RSCDA

6    account;" is that correct?

7    A.   Yes, the RCA account.

8    Q.   And that account is the secret account that we're talking

9    about?

10   A.   Yes.

11   Q.   I'll use the term secret account.

12   A.   Okay.

13   Q.   The secret account was opened in 1990?

14   A.   Yes.

15   Q.   So, she, in effect, admitted to you that she started

16   stealing in 1990.

17   A.   She said she started stealing when she opened up the secret

18   account.   She thought that was 1999 or 2000.

19   Q.   Okay.   But she gave you an event, the opening of the

20   account.

21   A.   Right.

22   Q.   Of course, Ms. Crundwell wasn't prepared for an interview by

23   you at that time, was she?

24   A.   No, I don't believe so.

25   Q.   You didn't call and say, "We're coming down to talk to you

Garry - Cross

1    about all this matter."

2    A.    No.

3    Q.    She was called into the office, you were introduced to her,

4    and here we go; is that correct?

5    A.    That's correct.

6    Q.    She did explain to you how she accomplished this crime;

7    isn't that correct?

8    A.    She provided further details.  We already had a good idea,

9    but, yes, she provided further details about how she

10   accomplished the crime.

11   Q.    Well, by opening the account, the secret account, and using

12   the money from the capital development account to funnel money

13   into the secret account.

14   A.    Yes.

15   Q.    And that's information that you verified; is that true?

16   A.    Yes.  She confessed to that information that we had.

17   Q.    Now, after that initial meeting -- well, Ms. Crundwell met

18   with you and talked with you for some period of time that day;

19   is that right?

20   A.    That's right.

21   Q.    She told you about assets that she owned?

22   A.    That's right.

23   Q.    She detailed those assets for you?

24   A.    That's correct.

25   Q.    She detailed questions about the various banks that you had;

Garry - Cross

1    is that correct?

2    A.   That's correct.

3    Q.   She described to you where evidence that you might be

4    interested would be located?

5    A.   That's correct.

6    Q.   She told you about items in her home and I think in her

7    office or in her bedroom?

8    A.   That's correct.

9    Q.   She told you about jewelry?

10   A.   Yes.

11   Q.   She told you about how she maintained her horses?

12   A.   Yes.

13   Q.   She told you what computer she used for that information,

14   and you were able to seize that computer; is that correct?

15   A.   She told us about a thumb drive where she kept the

16   information.

17   Q.   And she led you or told you where it was, and you were able

18   to seize it and obtain information that was useful to the

19   government; is that correct?

20   A.   That's correct.

21   Q.   What time did you first meet with Ms. Crundwell on April

22   17th?

23   A.   Approximately 9:15.

24   Q.   And what time did you leave Ms. Crundwell?

25   A.   I want to say sometime around noon.

Garry - Cross

1  Q.  Okay.  And during that three hours, roughly three hours, she

2  was talking to you about this entire scheme; is that correct?

3  A.  That's correct.

4  Q.  About the assets obtained, where the assets could be found,

5  and like where the invoices were; is that correct?

6  A.  That's correct.

7  Q.  After April 17th, Ms. Crundwell met with you a number of

8  times?

9  A.  That's correct.

10  Q.  She met with you at the FBI office?

11  A.  Yes.

12  Q.  You might have met once or twice in Beloit?

13  A.  I don't recall whether she met in Beloit.  I know we met in

14  Dixon.

15  Q.  Okay.  You indicated that you became aware of this other

16  fund, the Sister City fund, in April of 2012?

17  A.  That's correct.

18  Q.  You must have put it to the side and not thought about it

19  much anymore; is that correct?

20  A.  Well, I thought it was relevant, that it showed that the

21  scheme may have been earlier, but we didn't think that the

22  amounts were significant enough to include in the loss amount.

23  Q.  Okay.  But the purpose of meeting with Ms. Crundwell was to

24  ascertain the scope of this criminal activity, wasn't it?

25  A.  Right.  Well, primarily the purpose was related to the

PDF created with pdfFactory trial version www.pdffactory.com

Garry - Cross

1  forfeiture of the assets and identifying where certain assets

2  were.

3  Q.   But you asked questions of her during these meetings

4  relating to the crime at hand, didn't you?

5  A.   Yes.

6  Q.   And she answered those questions?

7  A.   Yes.

8  Q.   Did you ever once talk to her about the Sister City account?

9  A.   No, I don't think I did.

10 Q.   Did any agent to your knowledge talk to her about the Sister

11 City account?

12 A.   No.

13 Q.   And that account had been dormant since about 1990, as far

14 as what you were able to put together; is that correct?

15 A.   I think 1991.  That's correct.

16 Q.   We touched upon the meetings, and I believe you have signed

17 a stipulation regarding that; is that correct?

18 A.   I didn't sign a stipulation, but I agree with what was --

19 Q.   You read it and --

20 A.   Yes.

21        MR. GAZIANO:  May I have one second?

22        THE COURT:  Yes.

23    (Brief pause.)

24        MR. GAZIANO:  No further questions, your Honor.

25        THE COURT:  You don't have anything further?

Stichter - Direct

1      MR. PEDERSEN:   No.

2      THE COURT:   Step down.

3      (Witness excused.)

4      THE COURT:   Call your next witness.

5      MR. PACCAGNINI:   Your Honor, the government calls

6  Michael Stichter.

7      (Brief pause.)

8      THE COURT:   Raise your right hand.

9      (Witness duly sworn.)

10      THE COURT:   Be seated.   Speak into the microphone,

11  please.

12          MICHAEL STICHTER, GOVERNMENT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14  BY MR. PACCAGNINI:

15  Q.   Good morning.

16  A.   Good morning.

17  Q.   Could you please state and spell your last name?

18  A.   Michael Stichter, S-t-i-c-h-t-e-r.

19  Q.   Are you employed?

20  A.   Yes.

21  Q.   Where are you employed?

22  A.   City of Dixon, street department.

23  Q.   How long have you been with the street department?

24  A.   32 years.

25  Q.   What's your position?

PDF created with pdfFactory trial version www.pdffactory.com

Stichter - Direct

1   A.   Superintendent.

2   Q.   How long have you been a superintendent of the street

3   department?

4   A.   Eighteen years.

5   Q.   Now, as part of your duties as a superintendent, are you in

6   charge of your department's budget?

7   A.   Correct.

8   Q.   Could you describe the budget process that you would go

9   through?

10   A.   Describe it?

11   Q.   Yes.

12   A.   Well, it would be in March we'd go through our budget, and

13   they would say this is how much money you need to cut from the

14   budget.  They give us an overall.  And then we go from there.

15   Q.   When you say they, who are you referring to?

16   A.   The rest of the department heads and the commissioners.

17   Q.   Now, how would you go about determining your budget, how

18   much you needed?

19   A.   The last few years I would just go by what was on the budget

20   from the year before.

21   Q.   And why is that?

22   A.   We're sitting there with no money.

23   Q.   Who is they?

24   A.   Commissioners and comptroller.

25   Q.   And who was the comptroller?

Stichter - Direct

1    A.    Rita Crundwell.

2    Q.    Are you familiar with Rita Crundwell?

3    A.    Yes.

4    Q.    Did you have an opportunity to talk to her and see her in

5    person?

6    A.    Every now and then.

7    Q.    Do you see her today in court?

8            THE COURT:    Oh, you don't have to identify her again.

9            MR. PACCAGNINI:    Okay.

10   BY MR. PACCAGNINI:

11   Q.    Who would attend the budget meetings?

12   A.    All department heads and commissioners and the mayor and

13   Rita Crundwell.

14   Q.    Would Rita Crundwell speak at those meetings?

15   A.    Yes, she would.

16   Q.    And what would she say about the city's finances?

17   A.    She would just be an example that the state was behind on

18   payments and that and that the budget was in a crisis.

19   Q.    Did you ever talk to her personally about the city's

20   finances?

21   A.    I have a couple times.

22   Q.    And what would she say about the city's finances?

23   A.    That the money wasn't there.

24   Q.    How many employees do you supervise?

25   A.    Five.

### Stichter - Direct

1  Q.   What's the most you've ever had that you supervised as part

2  of the department?

3  A.   When I became superintendent, we had nine employees out

4  there.

5  Q.   What happened to the other four employees?

6  A.   Lack of funds is what I was told.

7  Q.   Were they fired or retired?

8  A.   Retired.

9  Q.   Were they replaced?

10 A.   Some were replaced, but, like I say, we're six guys there

11 now.   When I first started, there was nine employees in the

12 street department.

13 Q.   While you were superintendent, were any employees ever laid

14 off due to budget?

15 A.   No.

16 Q.   Was there any discussions about layoffs?

17 A.   Yes.

18 Q.   When was that?

19 A.   Last year's budget session.

20 Q.   What was discussed?

21 A.   Discussed the way the money was coming into the city,

22 whatever, there would be a possibility that there could be

23 layoffs.

24 Q.   Now, what are your duties -- well, what are the street

25 department's duties?

Stichter - Direct

1  A.   Street department?  Spring, summer, fall, sidewalk, curb,

2  gutter, stone, sewer, just maintenance of streets.

3  Q.   And does that include also resurfacing streets?

4  A.   We do not do that.  We're not capable of that.

5          MR. PACCAGNINI:  Could I have one moment, your Honor?

6          THE COURT:  Go ahead.

7      (Brief pause.)

8  BY MR. PACCAGNINI:

9  Q.   What type of equipment does the street department have?

10  A.   We have ten dump trucks, pickup truck with a plow, three

11  other pickup trucks, pot patcher, weight machine, backhoe,

12  loader, back machine.

13  Q.   Now, if the streets were going to be resurfaced, would that

14  be your department's responsibility?

15  A.   Usually what we did is we would farm that out.  A contractor

16  would come in to do that.

17  Q.   Was there a plan at some point to resurface all the streets

18  over a ten-year period?

19  A.   Yes.  Years ago we had a five-year plan.

20  Q.   And did that ever happen?

21  A.   It hadn't happened since the last two years.

22  Q.   What was the cost associated with the plan?

23  A.   It depended on how many blocks we were going to do.

24  Q.   Now, you said it hadn't happened for the last two years.

25  What's happened in the last two years?

Stichter - Direct

1    A.   The last two years we've ended up resurfacing 65 blocks.

2    Q.   Now, do you know approximately how many miles there are of

3    street in the City of Dixon?

4    A.   There's over a hundred.

5    Q.   And do you know how many miles the 65 blocks encompasses?

6    A.   Say four blocks to a half mile.

7    Q.   Now, when you talked about the various equipment that the

8    street department has, did you ever ask the defendant for money

9    for new equipment for your department?

10   A.   Yes, I have.

11   Q.   Why were you asking for new equipment?

12   A.   Our equipment's getting old.  The oldest piece of equipment

13   we have is a truck at 1994.

14   Q.   Did you have any safety concerns about your equipment?

15   A.   Yes.

16   Q.   And what were those?

17   A.   The rust and stuff from the salt from the boxes, you know,

18   the boxes and that, and plus just the miles and that, the wear

19   and tear on the vehicles.

20   Q.   And what did defendant say to you when you asked for more

21   money for equipment?

22   A.   There wasn't any money, and she just made the comment once,

23   "Mickey, if you know where there's a money tree at," she says,

24   "I'd be willing to get you a dump truck."

25          MR. PACCAGNINI:  No further questions, your Honor.

Blackburn - Direct

1    THE COURT:  Any cross?

2    MR. GAZIANO:  No, your Honor.

3    THE COURT:  You may step down.

4    (Witness excused.)

5    THE COURT:  Call your next witness.

6    MR. PEDERSEN:  David Blackburn.

7    (Brief pause.)

8    THE COURT:  Again, if you can shorten your witnesses, I

9    do have Exhibit Number 5, which is exhaustive as to this type of

10   evidence.

11   Face me and raise your right hand.

12   (Witness duly sworn.)

13   THE COURT:  Be seated and speak up into the microphone.

14   DAVID BLACKBURN, GOVERNMENT'S WITNESS, SWORN

15   DIRECT EXAMINATION

16   BY MR. PEDERSEN:

17   Q.  Good morning, sir.  Could you state your name and spell your

18   last name, please?

19   A.  David Blackburn, B-l-a-c-k-b-u-r-n.

20   Q.  Are you a current commissioner for the City of Dixon?

21   A.  Yes, I am

22   Q.  How long have you been a commissioner?

23   A.  I was elected -- I began serving May 1st of 1991.

24   Q.  And you're familiar then with the defendant in this case,

25   Rita Crundwell; is that correct?

Blackburn - Direct

1    A.   Yes, I am

2    Q.   She's the comptroller for the city?

3    A.   Yes.

4    Q.   Or she was the comptroller from 1991 all the way through her

5    arrest in April of 2012?

6    A.   Yes.

7    Q.   And when you were first elected commissioner, were you the

8    commissioner of health and safety?

9    A.   Yes, I was.

10   Q.   Did you take over as finance commissioner in May of 2011?

11   A.   Correct.

12   Q.   But during the entire time that you were on the city council

13   as a commissioner, did you participate in the budget process

14   every year?

15   A.   Yes, I did.

16   Q.   And was the defendant present at those meetings?

17   A.   Yes.

18   Q.   And when certain cuts were discussed, would the defendant

19   speak to indicate whether or not there were funds to pay for the

20   items that were requested?

21   A.   At the budget sessions, cuts were offered voluntarily, and

22   then toward the end or whatever, the finance commissioner at the

23   time would make some adjustments.  But no, I do not remember her

24   saying that there was money for some of those items that were

25   cut.

## Blackburn - Direct

1  Q.   And as far as the financial situation when you took over as
2  finance commissioner, prior to that were you aware of the city
3  having to obtain tax anticipation warrants?
4  A.   Yes, I was.
5  Q.   So, what are tax anticipation warrants?
6  A.   Basically, it's borrowing against next year's property
7  taxes.
8  Q.   And when did that occur?
9  A.   I believe we did it in the 2010 season, borrowed in advance.
10 Q.   Was that approximately three million dollars that was
11 borrowed?
12 A.   I believe so.  I don't know the number off the top of my
13 head.
14 Q.   And in your capacity as a commissioner, since the
15 defendant's arrest have any citizens addressed concerns to you
16 regarding their confidence in the city council and the mayor's
17 ability to govern?
18 A.   Initially right after the arrest, there were protesters
19 outside city hall, had picket signs and voiced their displeasure
20 for a number of weeks.  We also had some people appear before us
21 at the city council meetings and pretty much chastised us for
22 what took place.
23 Q.   And during March of 2012, prior to the defendant's arrest,
24 were layoffs being discussed for the city?
25 A.   We had talked about having to pare back at some point.  It

PDF created with pdfFactory trial version www.pdffactory.com

Blackburn - Direct

1    was difficult to make the payment obligations that we had.

2    Q.   And prior to that time, though, due to the lack of funds,

3    when individuals retired, was the workforce for the city being

4    reduced just based on attrition?

5    A.   Yes, it was.

6    Q.   When someone retired, they weren't replaced?

7    A.   In most departments that was the case.

8            MR. PEDERSEN:   That's all the questions I have.   Thank

9    you, your Honor.

10           THE COURT:   Mr. Gaziano.

11           MR. GAZIANO:   One second, your Honor.

12       (Brief pause.)

13           MR. GAZIANO:   No questions.

14           THE COURT:   You may step down.

15       (Witness excused.)

16           THE COURT:   Call your next witness.

17           MR. PEDERSEN:   I call Danny Langloss.

18       (Brief pause.)

19           THE COURT:   Raise your right hand.

20       (Witness duly sworn.)

21           THE COURT:   Be seated.

22          DANNY LANGLOSS, GOVERNMENT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24   BY MR. PEDERSEN:

25   Q.   Good morning, sir.   Could you state your name and spell your

Langloss - Direct

1    last name, please?

2    A.    Danny Langloss, Jr.   L-a-n-g-l-o-s-s.

3    Q.    And how are you employed?

4    A.    Employed by the City of Dixon.   I'm the police chief.

5    Q.    How long have you been a police officer?

6    A.    Sixteen and a half years.

7    Q.    How long the chief?

8    A.    Four and a half.

9    Q.    And in your capacity as one of the department heads for the

10   City of Dixon, did you have occasion to come in contact with the

11   defendant, Rita Crundwell?

12   A.    Yes.

13   Q.    And during the course of your duties as the department head,

14   did you have to participate in the budgeting process?

15   A.    I did.

16   Q.    And were you given materials by Rita Crundwell, a packet,

17   basically, to submit your proposals for the budget each year?

18   A.    Yes.

19   Q.    And did those come with cover sheets?

20   A.    They did.

21   Q.    I'm going to show you what's been marked as Government's

22   Exhibit 10.   Do you recognize those?

23   A.    I do.

24   Q.    What are those?

25   A.    These are the budget sheets.   One is for fiscal year

PDF created with pdfFactory trial version www.pdffactory.com

Langloss - Direct

1  2012-2013.  One is for the fiscal year 2011-2012.  And one's for

2  the fiscal year 2010-2011.  All of them have animations on them

3  Q.  And those were on there when you received those budget

4  packets from the defendant, Rita Crundwell?

5  A.  That's correct.

6  Q.  Now, as part of the budget process, had you made requests

7  prior to the defendant's arrest in April 2012 to update the

8  radio system for the City of Dixon Police Department?

9  A.  Yes.

10  Q.  And why did you make that request?

11  A.  There are several areas within the city that don't have

12  portable radio coverage.  At times the officers would be out in

13  those areas, they need to reach the dispatch center, and they

14  can't because there's dead spots.  And so, those dead spots

15  started to worsen quite a bit over the past few years.  So, we

16  really needed to get that fixed for the officers' safety.

17  Q.  And did you obtain a proposal for how much it would cost to

18  solve the problem?

19  A.  Yes.

20  Q.  And what was the cost that you received to update the radio

21  system, and when did you receive that proposal?

22  A.  I received them about two years ago, maybe going on three

23  now.  And we had a few different proposals.  They ranged from 80

24  to a hundred thousand dollars.

25  Q.  Have you recently obtained another proposal as to what it

PDF created with pdfFactory trial version www.pdffactory.com

Langloss - Direct

1    would cost to update the radio system now?

2    A.   Yes.   Just this week we got a proposal from Motorola that

3    said it will now cost $260,000.

4    Q.   And have you made a request to obtain funding to update the

5    radio system?

6    A.   We're just beginning that process now.

7    Q.   So, the radio system still has not been updated; is that

8    right?

9    A.   The radio system was narrow banded recently, but that didn't

10   address the issues we were having with the system   There was no

11   money from the city to do that project.   Fortunately we received

12   a grant through a countywide grant to update the portable radios

13   and the in-car radios to take them from wide band to narrow

14   band, but that has actually made -- the grant didn't include for

15   the voting sites that we need to take care of the dead spots,

16   and that's actually made our coverage worse.

17   Q.   Now, since the defendant's arrest, in your capacity as

18   police chief, have any citizens addressed their concerns

19   regarding their confidence in the city government in the wake of

20   the defendant's arrest?

21   A.   Yes, sir.

22   Q.   And what have those concerns been?

23   A.   Well, most of the people I've been talking to, it's

24   completely destroyed their faith in our city's government, in

25   our elected officials, in our department heads.   You know, the

1    questions out there, how could this happen up, how could this go

2    on for so long.   And the city has a pending lawsuit right now

3    with several different organizations.   So, we really can't

4    respond and talk about the things that were in place and that

5    did happen, but this has come at a significant price for the

6    city, a price that is substantial, regardless of the financial

7    amount.

8             MR. PEDERSEN:   That's all the questions I have.   Thank

9    you, your Honor.

10             THE COURT:   Mr. Gaziano?

11             MR. GAZIANO:   No.   Thank you, your Honor.

12             THE COURT:   You may step down.

13             THE WITNESS:   Thank you.

14        (Witness excused.)

15             THE COURT:   Call your next witness.

16             MR. PEDERSEN:   Your Honor, our remaining two witnesses

17    we can cut short at this time, as long as the court understands

18    and is taking as a fact that as far as the sewer project that we

19    alluded to in our motion for upward variance, Mr. Mahan from the

20    City of Dixon would testify that when they initially proposed

21    this project in 2008, it cost $80,000.   After the defendant's

22    arrest in August of 2012, the city paid $400,000 to do the

23    maintenance that should have been done in 2008.

24             And then Curt Phillips from the public works department

25    would just testify that because of the budget shortage, they

1    weren't able to mow the cemetery that the City of Dixon

2    maintains on a regular basis, and the grass was overgrowing at

3    the cemetery due to the lack of funds to complete the mowing.

4    So, that would be the other two witnesses.

5              THE COURT:  Any objection to that offer?

6              MR. GAZIANO:  No.

7              THE COURT:  Those facts as just stated will be accepted

8    as facts.

9              MR. PEDERSEN:  We have no further witnesses at this

10   time.

11             THE COURT:  All right.  The mayor is not going to

12   testify?

13             MR. PEDERSEN:  Well, he's not going to testify, but

14   he's going to make a statement.

15             THE COURT:  All right.  I'm sorry.  Call him

16             MR. PEDERSEN:  All right.

17             THE COURT:  I'm going to have him on the witness stand.

18   Be seated and identify yourself.  And you're testifying on

19   behalf of the City of Dixon, the victim in this case.  So, you

20   have a written statement.

21             MR. BURKE:  That is correct.

22             THE COURT:  All right.  Then identify yourself, and

23   then give me your statement.

24             MR. BURKE:  Okay.  Thank you, your Honor.  My name is

25   Jim Burke.  I'm mayor of the City of Dixon.

1      Thank you, Judge, for allowing me a few minutes to

2  speak on behalf of the Dixon community, the victim in the Rita

3  Crundwell embezzlement case.  Rita was trusted, admired, and

4  well thought of by many, especially the approximately 100

5  coworkers and other city employees who interacted with her

6  almost daily, including the community at large.

7      Many have asked themselves and others what, where, and

8  how this profound fault line in her character that led to this

9  massive ripoff of public money.  I state emphatically this theft

10  without conscious attitude was not a product of her city hall

11  work environment.

12      Rita began working part-time at city hall while in her

13  teens.  Her immediate supervisor and mentor was city treasurer

14  Darlene Herzog, now deceased.  Darlene had a flawless level of

15  honesty and ethics which were in full view as she taught Rita

16  the ins and outs of city finances.  Darlene groomed Rita to be

17  her replacement upon retirement.

18      There was and is no culture of corruption at Dixon city

19  hall.  The city has a long tradition of impeccable integrity by

20  those both elected and appointed holding the reins of

21  government.  A mindset of dishonesty was not encouraged,

22  demonstrated, or foisted upon Rita Crundwell by any elected or

23  appointed city officials.  The seed of dishonesty was planted,

24  nurtured, and brought to full bloom by Rita.  She is the sole

25  cause of Crundwell and crime becoming synonymous.

PDF created with pdfFactory trial version www.pdffactory.com

1    Rita has sacrificed everything for a life of glitter

2  and gold constructed on a deck of cards with no foundation.  She

3  was motivated, in the words of Dixon police chief Danny

4  Langloss, by trophies and horses or, in the words of

5  Shakespeare's tragedy of King Richard III, "A horse, a horse.

6  My kingdom for a horse."

7    I am sure when Rita stole her first city dollar, she

8  thought she would pay it back some day.  However, at some point

9  she had to know as she embezzled larger and larger amounts that

10  it would be impossible to repay, but she continued to steal,

11  anyway.

12    As the city's chief financial officer, Rita Crundwell

13  had a ringside seat viewing the consequences to the community of

14  her ongoing embezzlement of public funds.  She drove on the

15  streets that didn't get repaired or replaced because of her

16  theft.  She saw city employees every day that had gone over

17  two years without raises because of her theft.  She saw the

18  street department trucks well past their useful life that

19  couldn't be replaced because of her theft.  She saw the results

20  of deferred maintenance on almost every city department because

21  of her theft.  In short, Rita Crundwell saw firsthand the

22  penalty the city was paying for financing her high flying, 20

23  plus years, super ego lifestyle averaging well over two million

24  dollars per year.  She had the good life, without conscience and

25  regard for the taxpayers and her coworkers.

PDF created with pdfFactory trial version www.pdffactory.com

1    Rita must pay the price.  We are aware that since her

2    arrest Rita has cooperated with the authorities, which is

3    appreciated.  However, with it being a blatant, almost

4    defenseless crime, she had no good option.  Cooperation must not

5    be gauged serious punishment for wrongdoing.

6         Your Honor, the Dixon community is not vindictive.  The

7    Dixon community is not seeking revenge.  However, the Dixon

8    community is pleading for justice and a sentence for Rita

9    Crundwell that is commensurate with the theft of $53 million of

10   public money.  On behalf of the Dixon community, I appeal and

11   implore you to sentence Rita Crundwell for the maximum term

12   allowed for the crime she committed against her fellow citizens.

13        On personal comments concerning Rita, her future

14   obviously is dark and bleak, but life's not over 'til it's over,

15   and I hope that you find purpose and meaning to your life.

16        Thank you, Judge, and thanks to the FBI, the

17   U. S. Attorney's Office, and the U. S. Marshal's Office for

18   bringing a successful conclusion to this traumatic offense

19   against the City of Dixon.  Thank you.

20        THE COURT:  Thank you.  You may step down.

21        MR. BURKE:  Thank you.

22        THE COURT:  All right.  We've concluded the evidentiary

23   portion of this hearing.  Mr. Gaziano, did you want to submit

24   the two stipulations, or have you already given it to the clerk?

25        MR. GAZIANO:  I did submit them

1    THE COURT:  All right.  Then we're prepared to proceed
2  with arguments at this time.  It's 10:25.  Normally I'd take a
3  break now.  I'll ask the lawyers.  Because of the number of
4  people in the audience, I think a break would not be conducive
5  to quickly disposing of this case.  So, unless one of the
6  lawyers is asking for it, we're going to continue.
7    MR. PEDERSEN:  That's fine, Judge.
8    MR. GAZIANO:  We're fine.
9    THE COURT:  All right.  Go ahead.  And I've obviously
10 read all the materials you've sent me.  You may give me your
11 highlights of what your argument is.
12   MR. PEDERSEN:  Thank you, your Honor.
13   Your Honor, this is the exceptional type of case where
14 the 3553(a) factors weigh in favor of varying above the
15 guideline range.  The sheer magnitude of the defendant's fraud
16 in this case in terms of the amount and the length of time that
17 she perpetrated this scheme is simply astonishing.  $53 million
18 over 20 years.  Very likely the most prolific theft of public
19 funds in Illinois history by a public official.
20   As Government's Exhibit 16 shows, your Honor, the
21 defendant started small.  And when I say small, it's in relative
22 to what she was taking at the end.  The first year of 1991 she
23 took $181,000.  By the end she was taking over five million a
24 year.
25   She used her position as a trusted official for the

1    City of Dixon to further her scheme and to prevent her from

2    getting caught for over two decades.    Not only did the defendant

3    steal money from the City of Dixon, she lied about the reason

4    for the lack of funds and then callously sat silent during the

5    budget meetings year after year as the city had to make painful

6    cuts.

7            As set forth in our motion for an upward variance in

8    response to the defendant's sentencing memorandum, we believe

9    that an upward variance is appropriate in this case because

10   there are several factors that are present in the defendant's

11   case that are not adequately taken into account by the

12   guidelines.    Those factors include the nature and circumstances

13   of the offense, the seriousness of the offense, the defendant's

14   history and characteristics, and other factors, such as the need

15   to promote respect the for law and for general and specific

16   deterrence.    All those factors weigh in favor of an above

17   guideline sentence.

18            Regarding the defendant's character, one of the

19   exhibits, Government's Exhibit 10, shows the budget sheet covers

20   that the defendant was providing to the department heads.    Cut,

21   someone drowning.    The psychological effect of this was to

22   discourage the department heads from requesting money because

23   she was taking all the spare money and more that the City of

24   Dixon had.    Her comment to the street commissioner or street

25   superintendent, Mr. Stichter.    "If you know where there's a

1  money tree, let me know."  That demonstrates the defendant's

2  character, your Honor.

3          She stands before you today and through her attorney

4  I'm sure will argue that her cooperation in this case warrants a

5  sentence at the low end of the guideline range.  Our position is

6  that her cooperation was not extraordinary.  When she was

7  confronted, she did admit stealing the money from the City of

8  Dixon, but she still minimized her conduct in terms of the

9  amount she took and the length of the scheme.  She says to

10  Special Agent Garry that she believes that she started the

11  scheme in 1999 or 2000, and then she later says that it was when

12  she opened the RSCDA account, which was ten years earlier.  But

13  in the second line of her written statement, she states, "I

14  needed money to purchase a horse by the name of Sheza Telusive

15  Kid," and that horse was purchased in April of 2001.  That we

16  know.

17          The defendant's conduct in agreeing to cooperate and

18  turn over the assets that she acquired as a result of this

19  scheme does not demonstrate the type of extraordinary acceptance

20  of responsibility that would warrant a sentence at the low end

21  of the guideline range.  She merely agreed to assist in the

22  collection and disposal of assets that she never should have

23  been able to acquire in the first place.  She agreed to return

24  property that she only obtained through her execution of the

25  scheme to defraud the City of Dixon.

PDF created with pdfFactory trial version www.pdffactory.com

1    We anticipate recovering approximately ten million of

2    the $53 million that the defendant stole through the sale of

3    those assets.  That still leaves $43 million that the city has

4    little hope of recovering from the defendant.  So, the recovery

5    will be less than 20 percent of what she stole.

6            So, for all those reasons, the government's position is

7    that her cooperation in the collection and disposal of the

8    assets was adequately taken into consideration when the

9    government made the decision not to file any additional wire

10   fraud or money laundering counts and capping the defendant's

11   sentence at 20 years.  We don't believe any further

12   consideration is warranted.

13           The defendant may argue that she has no criminal

14   history.  However, she went on a 20-year crime spree, basically,

15   throughout this scheme.  Every day she was walking into the city

16   hall purportedly doing her job, when the real reason she was

17   there was to steal money.  There was no evidence that she ever

18   intended to stop this scheme.  At the time she was caught, she

19   had already taken over $300,000 just in the month of March alone

20   and 1.5 million up to that point of 2012.

21           Day after day she lied to city officials about the

22   reason for the lack of funds as she stole millions of dollars

23   and funded her extravagant lifestyle.  And as the court

24   indicated, you've reviewed the photos.  The residence that she

25   lived in, that she was able to remodel for $450,000 using the

1   city's money.  She purchased vehicles, the trailers that she

2   used in her operation, purchased boats, the house in Florida,

3   the motor homes, most recently the megabus that she purchased

4   for two million dollars.  Numerous items of jewelry that she

5   would wear when she went to the horse shows that she traveled to

6   throughout the country.

7          And all this occurred at the same time the city was

8   being forced to reduce services, put off maintenance and repairs

9   to city property, not replace individuals when they retire.  The

10  police department, as Chief Langloss just testified to, did not

11  have the 80,000 to a hundred thousand dollars they needed to

12  make their radio system safer.  At the same time, the defendant

13  is providing budget covers to the police chief showing a

14  drowning man.

15         The street department couldn't resurface the streets.

16  And as I indicated, things were so bad that the city couldn't

17  even afford the money necessary, the minimal amount of money

18  necessary, to properly maintain the cemetery for the City of

19  Dixon.  Layoffs were being discussed.  If the defendant had not

20  been caught in her scheme, numerous individuals potentially

21  could have been laid off from the City of Dixon.

22         As indicated in our materials, in 2012, in March of

23  2012, Commissioner Blackburn described the problem with the

24  budget as borderline catastrophic.  They couldn't spend any

25  money unless it was absolutely essential to that day's or the

1    next day's operation.   That's the situation that this defendant

2    created for the City of Dixon.

3              All of these harms that are outlined in Government's

4    Exhibit 5 demonstrate the type of nonmonetary harm that's

5    discussed in Guideline Section 2B1.1 that's not adequately taken

6    into consideration by the guidelines and, therefore, is a basis

7    for the court to depart upward from the guideline range.

8              Further, the defendant's conduct in perpetrating this

9    scheme to defraud for over 20 years and taking the $50 million

10   has caused significant disruption of governmental function by

11   causing the citizens of Dixon to lose confidence in their

12   governmental officials.

13             As we cited in our briefs, your Honor, the court could

14   take judicial notice of that fact just based on the dollar

15   amount and the length of time the defendant perpetrated this

16   scheme.  We also attached news articles in our Exhibit 7, and

17   then the testimony that you heard from the Dixon officials today

18   all support the fact that the defendant's crimes have caused the

19   citizens of Dixon to lose confidence in their government, and

20   this disruption of governmental function warrants an upward

21   variance from the guidelines range.

22             While the city was suffering, the defendant was living

23   her dream, her dream of becoming a champion quarter house

24   breeder using city funds to fund her dishonorable lies to the

25   top of the quarter horse breeding world.   She criss-crossed the

PDF created with pdfFactory trial version www.pdffactory.com

1    country in her luxury motor homes from show to show.  Her

2    entourage used semi trucks that she purchased with city money to

3    haul the horses she purchased with city money in fancy trailers

4    that she purchased with city money, and all this wowed the other

5    competitors at the horse shows.

6            She collected trophies year after year, as we showed in

7    our Government's Exhibit 5.  In addition, that photograph is a

8    display, Government's Exhibit 5-69.  The photograph on the left,

9    your Honor, was a stall that the defendant built at one of these

10   horse shows.  So, that was all constructed just for her to have

11   while she was at one of these horse shows, all while the City of

12   Dixon is in dire financial straits.  She even at one of the

13   horse shows paid for a mariachi band to perform and entertain

14   the other competitors.  She won so many awards that she had two

15   trophy rooms, both at her house and at the ranch, and those

16   photographs are contained in Government's Exhibit 5, as well.

17           But all these trophies came at a hefty cost to the City

18   of Dixon, but that fact was completely lost on the defendant.

19   As you heard, the defendant sat silent in these budget meetings

20   where cuts were discussed, but defendant just continued to

21   collect those precious trophies while she misled the city

22   officials about the lack of funds, the reason for the lack of

23   funds, and while deep cuts affecting city services and the

24   infrastructure of the city were made.  They couldn't afford to

25   repave streets, buy new street trucks, cuts to the police and

1    fire department budgets, couldn't replace employees who retired.

2    Layoffs were discussed. The city had to borrow three million

3    dollars in tax anticipation warrants.

4           Considering all those factors, your Honor, and all the

5    relevant factors in Section 3553(a), an upward variance of at

6    least four levels to level 38 is appropriate in this case. With

7    an offense level of 38, the defendant's range would be 235 to

8    240 months because of the statutory maximum, and we believe

9    because of the defendant's unprecedented betrayal of the trust

10    placed in her by the City of Dixon and her complete lack of

11    concern for the consequences caused by her fraudulent conduct,

12    such a sentence is justified, and we would ask the court to

13    sentence the defendant within that range.

14           We'd also ask as part of the sentence that the court

15    order restitution in the amount of $53,740,394 to the City of

16    Dixon, and we also ask that you enter the preliminary order of

17    forfeiture and enter a forfeiture judgment in the amount of

18    $53,740,394. Thank you, your Honor.

19           THE COURT: All right. Thank you.

20           Mr. Gaziano, you may step forward and give your

21    summation, and then I'll ask that you and the defendant step

22    forward, and she can give any statement, if she so desires.

23           MR. GAZIANO: That's fine, your Honor.

24           Thank you, your Honor. May it please the court,

25    counsel. I'm not going to go over everything in my sentencing

1    memo.  I do want to point out to the court that I believe that
2    the guidelines as determined by the probation officer adequately
3    set forth the needs of 3553 in this case.  We are asking for a
4    sentence within the guideline range.
5         I'd like to first address, if I might, the application
6    by the government for a variance or a departure from the
7    guidelines.  The government calls it a variance at times, and
8    they call it a departure.  I don't like to use those terms
9    synonymously, but I'll use the term departure.
10        THE COURT:  I usually use the term variance.
11        MR. GAZIANO:  I will use the term variance then.  I'll
12    accede to the court.  I think the court knows why I have always
13    done that as far as in other cases that I have appeared before
14    this court.
15        Reliance for the variance is based upon Application
16    Note 19 of 2B1.1.  Well, Application Note 19 requires that you
17    look under one, what caused the crime to occur.  Was it meant to
18    intend, was it meant for something other than financial
19    purposes.  That's not the case here.  So, then the government
20    falls to 19(A)(ii), which says that the offense must cause
21    substantial nonmonetary harm, physical harm, psychological harm,
22    emotional trauma, or an invasion of privacy.  I submit that
23    while this crime is significant -- and I'm not trying to say it
24    is not -- it does not meet the qualifications of 19(A)(ii).
25        The government tries to bootstrap by saying then let us

1   look at 5K2.7, which is the impact upon the government.   I

2   submit to the court that the guidelines 2B1 substantially punish

3   for the offense as set forth.   The government says look at the

4   deceit.   Well, fraud by its nature is a crime of deceit.   The

5   government says look at the use of funds.   Yes, she used the

6   funds.   She stole the funds.   We have never denied that.   She

7   stole the funds.

8           This court has been involved in other large scale

9   frauds.   This court has seen that those moneys have been applied

10  to addictions, cocaine or whatever, whatever purpose.

11  Fortunately in this case, there were significant assets left, a

12  substantial amount.   I know that the government is saying it's

13  20 percent.   But in many of the cases, we do not see the victims

14  obtain a 20 percent amount of restitution.   Often the money is

15  always gone, and the clients I've had have had no ability to

16  make any restitution.   Dixon is going to see a significant

17  amount of restitution.

18          The government says look at the length of the scheme.

19  Well, that's within the guidelines, too.   That's all stated

20  within the guidelines because it takes a long time to accumulate

21  that kind of loss.

22          Finally, the government says in its memos, well, look

23  at the effect it had upon the city officials, and this is where

24  I have a dispute with how the government is reading 5K2.7.   The

25  government cites to you three cases.   They site to you Pabey,

1    P-a-b-e-y, Gunby, G-u-n-b-y, and Paulus, P-a-u-l-u-s.  Those

2    cases are very different than the case of United States v.

3    Crundwell.  In Gunby a judge had diverted funds from the filing

4    fees of people going into court.  The effect that the Eleventh

5    Circuit found was that it called into question the integrity of

6    the judicial system, the entire judicial system

7            In Paulus, which was a Seventh Circuit case, an elected

8    prosecutor, whose duty was to prosecute crime, accepted 22

9    bribes for favorable dispositions in criminal prosecutions.  His

10   crime, the Seventh Circuit, called into question the integrity

11   of the judicial system

12           Here the citizens of Dixon, according to the newspaper

13   articles that the government attached and I believe the

14   testimony of Mr. Blackburn today, have asked questions.  They

15   want to know how did this crime occur.  That's not calling into

16   question the integrity of the government.  It's calling a

17   question that any citizen at any time has a right to ask an

18   elected official.  How did something happen.  We want to know.

19   We'd like to know.  That doesn't say that the people of the City

20   of Dixon are in revolt and have attacked the integrity of the

21   entire municipal government.  They have asked a question.  How

22   did this happen.  Explain it to us.

23           Now, in Pabey, P-a-b-e-y, that was a different case,

24   also.  Pabey was the mayor of East Chicago, Indiana.  He

25   diverted funds or caused funds to be diverted for the

1    construction of his own home or of a relative's home.  He, A,

2    never admitted his guilt, never came before a judge and said,

3    "I'm sorry for what I've done," never showed any remorse.  As a

4    matter of fact, he suborned perjury during the jury trial which

5    led to his conviction.  But he was the mayor of a city that

6    obviously had had corruption problems, unlike the City of Dixon,

7    if we listen to the words of Mayor Burke, who says corruption

8    doesn't occur in the City of Dixon.

9            East Chicago is different.  East Chicago -- he, Pabey,

10   ran on the ticket that said I'm going to clean it up.  He

11   offended the integrity of the electorate by lying to them

12   That's why there was a disruption or a 5K2.7.  Here

13   Ms. Crundwell does not -- her crime did not attack the integrity

14   of the system

15           Now, your Honor, we're asking, first of all, that a

16   four-level increase is unsupported by the government's request.

17   The government says but we took that into consideration in plea

18   negotiations.  That's not the standard here.  The standard here

19   today is 3553(a).  You have before you a lady who is 60 years of

20   age.  A sentence of the term that they're talking about is

21   basically a life sentence.  A sentence within the guidelines

22   gives us some opportunity and is sufficient to carry out the

23   purposes of 3553.  We are asking that you impose a sentence

24   within the statutory guidelines or within the sentencing

25   guidelines.  We believe that that comports with the statute.

1          We believe that you should take into consideration the

2    fact that Ms. Crundwell did immediately admit her guilt, did

3    immediately assist the government in many, many ways, and that's

4    borne out by the two stipulations that are presented to the

5    court today, the stipulation regarding Special Agent in Charge

6    Dobranski and also by Pat Garry.  This woman since the date of

7    her arrest has been most cooperative with the government,

8    meeting with them on a regular basis, on sometimes unscheduled

9    bases, all with the hope of making amends for what she has done

10   to the City of Dixon.  Therefore, I'm asking for the court to

11   sentence her within the statutory guidelines.  Thank you.

12          THE COURT:  Thank you, Mr. Gaziano.

13          Now would you step forward, Ms. Crundwell?  You are

14   afforded an opportunity to say anything in your own behalf.

15   Your lawyer has ably stated your case throughout this

16   proceeding, but you may give me any statement that you wish.  Go

17   ahead.

18          DEFENDANT CRUNDWELL:  Your Honor, I'd just like to say

19   I'm truly sorry to the City of Dixon, to my family, and my

20   friends.

21          THE COURT:  All right.  Thank you.

22          All right.  Remain standing there.  I will have a

23   sentencing result at this time.  I do want to state that I've

24   reviewed all the materials that have been given to me for this

25   sentencing proceeding, and they're lengthy.  And I've gotten

1    letters, and I've read all those.  I've gone over everything

2    twice.

3              This is a case that developed over 22 years.  So, I'm

4    going to take an opportunity now to explain my reasons for the

5    sentence that I'm going to impose, and from time to time I'm

6    going to refer to my notes, but I'm going to try to address all

7    the issues that have been raised, and particularly the court

8    must consider the 3553(a) factors, which I will go over in

9    detail.

10             I'm going to give you just at the outset a general

11   overview of how this crime appears to me.  This has been a

12   massive stealing of public moneys, moneys entrusted to you as a

13   guardian for the citizens of Dixon, Illinois.  You've harmed

14   both the city and its citizens.  This has extended over a

15   20-year period, and near the end of the period of stealing

16   public moneys, it amounts to almost five and a half million

17   dollars per year for two or three years.

18             The moneys that were stolen were used to further your

19   personal enjoyment, which was your quarter horse grading

20   business.  It also supported a lavish lifestyle.  And I've

21   looked through the exhibits that the government submitted, and

22   it's incredible to see the lifestyle that you did live of

23   purchasing multiple homes, remodeling homes, purchasing various

24   motor coaches to go to these conventions, ultimately a

25   $2.1 million motor coach.  You purchased farmland.  You

1    purchased horses.  You sold horses.  And at the time of your
2    arrest, there were some 400 horses which were in your control or
3    in some farm that you operated.  No question that you spent
4    money on yourself.  Jewelry, clothes, birthday parties.  At
5    conventions you hosted parties.  You lived the lifestyle
6    befitting a wealthy person, and you did this on moneys that were
7    not yours.
8            When you pleaded guilty, at that time I wondered two
9    things.  How were you able to steal this amount of money and,
10   secondly, why was this not discovered by someone.  I have the
11   answer to the first question, and that's been covered in the
12   submission of evidence before me, but I wanted to make sure that
13   I had looked at all the documents that how you perpetrated this
14   crime.
15           As to the second question, why wasn't it discovered by
16   someone since it was so massive and went on for 20 plus years, I
17   don't have the answer to that, and I don't have to decide that
18   because that's something that is up to the citizens of the City
19   of Dixon to look at their government administrators to see how
20   they administered their offices, and you were one of those
21   persons.  And as I understand it, there were auditors involved
22   who would audit city funds, and there's a lawsuit pending in
23   state court, and that will perhaps answer some questions.
24           But certainly the lifestyle that you led in a small
25   town of 15,000 population, with a person who is on a salary

1     of -- ultimately it was $90,000 -- must have wondered something.

2     Probably people wondered, well, she's just been successful in

3     her horse breeding operation.  Well, that may be an assumption

4     that people would make.  Why would a person who is living that

5     lifestyle need to continue on in a government job for that

6     period.  Again, that's something that is an overview of this

7     case as to how I view it.

8             Now, I'm going to get specific as it relates to the

9     3553(a) factors.  The statute sets forth factors that every

10    court is supposed to consider in arriving at a sentence in the

11    case, and pursuant to Section 3553(a), the court shall impose a

12    sentence sufficient but not greater than necessary to comply

13    with paragraph two, and paragraph two lists the various factors

14    that the court will consider.  One factor is the history and

15    characteristics of the defendant.

16            You have no prior convictions, and that's usually a

17    positive factor.  That is, no prior criminal convictions.

18    However, in this case, while you have no prior criminal record,

19    this criminal conduct for the crime that you committed was

20    conducted over a 20-year period.  So, in effect, you did not

21    live a law-abiding life for over 20 years.  The court also looks

22    at history and -- in looking at your characteristics, what were

23    these funds stolen for, and it went to your personal enjoyment

24    and to live a lifestyle of the very rich.

25            There are letters that support you that have been

1   written by persons, and I've read those.  And there are people

2   who think you contributed to the -- and had a real passion for

3   horses, and it was helpful to the quarter horse industry, and

4   they said that you've done other things that are beneficial to

5   them personally.  My response there is that you showed a much

6   greater passion for the welfare of your horses than that of the

7   people of Dixon who you represented.

8           My conclusion as to your history and characteristics is

9   that while you have no prior criminal record, what you did with

10  the money and the crimes that you committed for over 20 years

11  outweighs the fact that you have no prior criminal conviction.

12          The next factor that the court has to look at is the

13  nature and circumstances of this offense, and in looking at

14  that, the court only can conclude it's massive.  It took place

15  over 20 years.  To make sure that your crime was successful, you

16  had to deceive many people.  You created false documents.  You

17  misrepresented in meetings in public that there were no funds

18  available when you well knew that there were funds that you had

19  stolen that could have been used for city revenues.  So, I have

20  taken into consideration what these public officials have

21  testified to.

22          I've also read the letters that a lot of people

23  obviously have opinions that are contrary to those who support

24  you, and there's a great amount of bewilderness to the people of

25  that community in what you did.

PDF created with pdfFactory trial version www.pdffactory.com

1          The court, in terms of a financial fraud, cannot think

2   of hardly a worse or a bigger crime.  I've had a lot of

3   financial crimes before me.  I've had a lot of Ponzi schemes

4   where millions of dollars have been taken.  But the callousness

5   shown here, where you're taking in the last few years over five

6   million dollars and yet representing to the employees of the

7   City of Dixon and to the residents that there is no money, makes

8   this offense a very serious one, and that is one of the factors

9   that significantly weighs against you.

10          Another factor that the court has to consider is the

11  seriousness of the offense, and the sheer magnitude of

12  $53.7 million in your case and the deception over that long

13  period of time is enough aggravation, coupled with the other two

14  factors that I've discussed, to warrant a sentence at the high

15  end of the guideline range.  But I haven't even considered yet

16  the government's request for an upward variance, and I'm going

17  to go over that factor.  I think it fits into the seriousness of

18  the offense.  And so, I'm going to address what I think is --

19  what the law is and as it applies to the facts of your case.

20          I find that there are substantial bases to vary upward

21  in this case for these reasons.  First, pursuant to Section

22  2B1.1 of the guidelines, this court may vary upward if the

23  offense level under that guideline, and I'm quoting,

24  substantially understates the seriousness of the offense, and

25  there's an application note.  And the application note further

1   states that an upward variance may be applied if the offense

2   caused or risked substantial nonmonetary harm, such as

3   psychological harm or severe emotional trauma.

4           The Seventh Circuit Court of Appeals has affirmed an

5   upward variance under 2B1.1 based on the risk of nonmonetary

6   harm where the court found that the defendant's embezzlement of

7   public funds resulted in a loss of public confidence in the

8   honesty and integrity of elected officials.  And that's the

9   Pabey case.  The court varied upward in that case 27 months.

10          In this case there's no doubt that the offense level as

11  calculated under 2B1.1 substantially understates the seriousness

12  of your crime.  And while the offense level reflects the

13  significant amount of actual financial loss to the City of

14  Dixon, it does not capture the full effect of the extensive

15  damage your conduct inflicted on the city and its citizens.  The

16  numerous letters by citizens of Dixon for the court, that were

17  written to the court, convey that they have been collectively

18  damaged both psychologically and emotionally in terms of the

19  severe loss of confidence in their local government, both in you

20  and in other government officials.

21          There's no question that such an extensive, protracted,

22  and undetected fraud perpetrated against the city has

23  understandably shaken to the core the confidence the citizens of

24  Dixon have in their government, and that's both as to your

25  position and as to other government officials who are elected to

1    oversee you.

2          This type of nonmonetary harm I find is precisely the

3    impact contemplated by 2B1.1 and the application note.

4    Therefore, an upward variance in this case reflects the

5    considerations and sentencing policies that underscore an

6    application of 2B1.1 and is alone supported by this provision.

7          In addition, I find that an upward variance is

8    justified under Guideline 5K2.7, which applies to a defendant's

9    conduct that results in, and I quote, a significant disruption

10   of government function.   And there are cases that the government

11   has cited that I think are applicable, and other courts have

12   found upward variance.

13         In this case a significant disruption of government

14   function of the City of Dixon resulted from your criminal

15   conduct.   You stole an astronomical amount of money from the

16   city, which has crippled the city in the past and present and

17   there's evidence in the future in its ability to provide

18   essential government services.   This is clearly evident by the

19   exhibits that were attached to the government's brief.

20   Exhibit 5, which shows at the time you were spending moneys, the

21   city government was being told that it didn't have funds to do

22   some basic things, like repairing the streets, and the

23   government's brief, the brief on Pages 11 and 12 also give me

24   further examples of that.

25         It's ironical that on one of the exhibits, at a city

PDF created with pdfFactory trial version www.pdffactory.com

1   council meeting in 2011, one of the city commissioners was

2   stepping down who had been a longtime commissioner, and it was

3   unintentionally prophetic that that person stated about you --

4   he praised you, and he called you, quote, "A big asset to the

5   city as she looks after every tax dollar as if it was her own,"

6   end of quote. That's what you did, and as far as I'm concerned,

7   there is a disruption of government function in Dixon that has

8   gone on and will continue, and that's sufficient to show a

9   future disruption of government function as reflected in

10  Guideline 5K2.7.

11          There are several other factors that the court must

12  look at under 3553(a), and I've considered them, such as the

13  necessity to promote -- the sentence must be necessary to

14  promote respect for the law, to provide just punishment for the

15  crime, and to provide adequate deterrence. These all weigh for

16  a lengthy above guideline sentence in this case. You are

17  specifically deterred because of the length of the sentence.

18  Even under the guidelines you would be deterred, but this court

19  must impose a sentence which would provide general deterrence to

20  others who may think about this type of crime.

21          I've considered the assistance that you gave to the

22  FBI, and I've considered those letters that have been written in

23  your support. As I've said, there are plenty of letters that

24  are written that do not support you. All in all, you did

25  cooperate, but even today in the last few days I find out that

1    another fund has been -- moneys have been stolen out of that by

2    you back as early as 1988.

3          I've considered the good things about you, and they are

4    substantially outweighed by the other factors that I have

5    discussed, and, therefore, the court believes and finds that an

6    upward variance is appropriate in this case.

7          The sentence that I'm going to impose includes an

8    upward variance, and it reflects the 3553(a) factors that I've

9    discussed and promotes respect for the law and is just

10   punishment for the offense.  While your offense level was

11   increased substantially by the sheer amount of the loss in this

12   case, this case is a classic example of a crime whose impact

13   goes far beyond the mechanical calculation of the guidelines and

14   the applicable enhancements under the guidelines.  Your conduct

15   strikes at the very heart of the ability of the City of Dixon to

16   provide for the essentials of its citizenry, and I believe that

17   the sentence must reflect that unique and overwhelming harm in

18   this case.

19         Therefore, finding that a sentence of imprisonment

20   above the guideline range is appropriate, I have determined that

21   an increase of 25 percent over the high end of the guideline

22   range is appropriate.  This amounts to a sentence of 235 months

23   of imprisonment, and that amount of time also equates to a

24   two-level increase in the total offense level computation, which

25   is from 34 to 36.

1        Finally, let me say that my sentence of 235 months'
2   imprisonment includes consideration of conduct for which you are
3   facing indictment in state court, which is presently unresolved.
4   My sentence of this long term of imprisonment and order of full
5   restitution, in my opinion, is appropriate, full, and just
6   punishment for the offenses both in federal and state court.
7   Ultimately, it will be up to the state court judge, if there is
8   a judgment in that case, to determine what sentence that judge
9   would impose.
10       I've also considered in arriving at my sentence, which
11  is an upward variance, that you are 60 and that you would be
12  near 80 upon completion of the sentence, although you would get
13  good time credit and probably serve until you're 77.  This is
14  within -- and I've looked this up.  This is within your life
15  expectancy.  Someone your age under female life expectancy
16  tables statistically has a life expectancy of some 24 years.
17  So, that would be age 84.  So, your sentence in this case is not
18  a de facto life sentence, as discussed in a recent opinion of
19  the Seventh Circuit and mentioned by your attorney.
20       It's going to be the sentence of this court as follows.
21  You are sentenced to 235 months of imprisonment in the Bureau of
22  Prisons.  I'm going to recommend that the Bureau of Prisons, at
23  your lawyer's request, designate you to a facility closest to
24  Beloit, Wisconsin.
25       Following your release from imprisonment, I'm imposing

1    a sentence now of three years' supervised release with the

2    following conditions.  And supervised release is as if you were

3    on probation.  That is, you'll have rules and regulations that

4    you must follow, and those will be in the standard written

5    conditions that are set forth in an order that I will issue.

6           I will also sentence you to the following special

7    conditions.  One is that you shall make restitution once you

8    leave the Bureau of Prisons at 10 percent of any net monthly

9    income that you have.  At that point in time, I do not expect

10   that you will have income.  I do not expect that the city will

11   get any restitution from you.  But you have turned over

12   approximately ten million dollars of your assets, and my order

13   will include -- it's actually a judgment.  It will include that

14   if you have any future inheritance or come into some money that

15   that will be paid to satisfy restitution.

16          And I recognize that the government and Mr. Gaziano and

17   the defendant have also entered into a stipulation as to certain

18   funds to be turned over, and that includes the property that

19   we're talking about, and there's several personal loans that are

20   outstanding that people owe her money that will be turned over

21   to the government for restitution and ultimately to the City of

22   Dixon.  And has the income tax refund been paid yet?  Is that

23   part of the agreement?

24          MR. GAZIANO:  I have the check in my possession.  I'm

25   waiting for the government to tell me how to have it endorsed.

1          THE COURT:  All right.  Well, that shall be -- that's

2     part of the stipulation and assets.  So, that shall be paid over

3     immediately.

4          MR. PEDERSEN:  Right.  We would ask the court to as

5     part of the order order that any of the defendant's nonexempt

6     assets be subject to immediate execution, and then we can seize

7     those.

8          THE COURT:  I will do so.  The order of restitution is

9     as follows.  I will order that she pay $53,740,394 of

10    restitution, and that shall begin immediately.  I will further

11    order that she pay the $100 special assessment that every person

12    must pay who is convicted of a felony, and that shall be paid

13    forthwith.

14         I'm not going impose a fine in this case.  First of

15    all, she doesn't have any money.  Second of all, it would

16    inhibit the ability -- any fine would go to the federal

17    government, if she had money, and any restitution should go to

18    the City of Dixon.  So, I am not going to order any fine.

19         Next I will order that there be a preliminary order of

20    forfeiture that has already been tendered to me, and I will sign

21    that, and that is a forfeiture of assets that she's already

22    agreed to turn over.

23         As far as the sentence is concerned, is there anything

24    I've missed that either side wishes to bring up at this time

25    before I advise her of her appeal rights?

1    MR. GAZIANO:  No.

2    MR. PEDERSEN:  No, your Honor.

3    THE COURT:  All right.  I'm going to advise you of your

4    right to appeal.  Even though you've pled guilty, you have a

5    right to appeal issues that I have decided that were not waived

6    either by your plea agreement or by your entry or a plea of

7    guilty.  If you wish to file an appeal, you must file that

8    notice of appeal within 14 days of this date.  Otherwise, you

9    lose your right to appeal to a higher court to review what I've

10   done.

11   Secondly, you may file the notice of appeal yourself,

12   you may ask the Clerk of the Court to file it, or you may ask

13   Mr. Gaziano, and he would file it if you so ask him  But,

14   again, if you don't file it, there is no appeal.

15   Next, Mr. Gaziano has represented you ably as the

16   Federal Defender in this division because you have been without

17   funds.  You are without funds to the best of my ability.  So, if

18   you file a notice of appeal, Mr. Gaziano will continue as your

19   lawyer on appeal to prepare anything before the Court of

20   Appeals.

21   Now, is there anything else other than -- I presume

22   there's going to be an issue as it relates to when she is to be

23   taken into custody.

24   MR. PEDERSEN:  Correct, your Honor.

25   THE COURT:  Do you want to state your argument -- first

1    of all, is there anything before that other than that?

2         MR. PEDERSEN:  Your Honor, I don't know if the court

3    set a payment schedule when she's released from prison, as far

4    as restitution.

5         THE COURT:  I said 10 percent of her net monthly

6    income.

7         MR. PEDERSEN:  Sorry.  Then nothing else, your Honor.

8         THE COURT:  All right.  Mr. Gaziano, anything other

9    than the custody?

10        MR. GAZIANO:  No, your Honor.

11        THE COURT:  All right.  Go ahead.

12        MR. PEDERSEN:  Your Honor, the burden is on the

13   defendant at this point to prove by clear and convincing

14   evidence that she is not a flight risk or a danger to the

15   community.  The court allowed her to remain on bond prior to the

16   sentencing hearing.  The defendant did not know at that time

17   what type of sentence she was facing.  We believe that the

18   substantial sentence that the defendant is facing now weighs in

19   favor of the court finding that she is a risk of flight and that

20   the defendant should be detained today.

21        THE COURT:  All right.  Mr. Gaziano, you may proceed.

22   I do want to say that there are some changed conditions since

23   the time when I allowed her to remain out on bond at the time of

24   her plea.  There are some changed conditions.  So, you may

25   address that.  But the court is considering that she would be

1 taken into custody at this time.

2   MR. GAZIANO: I understand, your Honor, but I still

3 believe that we can establish by any standard that Rita

4 Crundwell will appear at the time and place designated by the

5 Bureau of Prisons. She has faithfully appeared at every court

6 appearance. She has faithfully met meetings with the FBI and

7 with this office. She has faithfully arrived for court today,

8 understanding what the judge's power was at the time of

9 sentencing. As the court has found, she has no assets from

10 which to flee. Therefore, we are asking that she be allowed to

11 self-surrender.

12   THE COURT: All right. Thank you.

13   The court is going to make a decision at this time.

14 I've thought about it before coming into court today, obviously.

15 The statute, 3143, provides that someone who is awaiting

16 imposition or execution of sentence be detained unless I find by

17 clear and convincing evidence that you are not likely to flee or

18 pose a danger to the safety of any other person or the

19 community, and I made that finding at the time you pled guilty.

20   There's several factors that have changed. One is that

21 you're now facing a longer term, substantially longer than you

22 had hoped. Your lawyer argued for a sentence at the low end of

23 the guideline range, and I found a sentence applicable that is

24 substantially, maybe seven and a half years above the low end of

25 the guideline range. That's a factor that could result in

PDF created with pdfFactory trial version www.pdffactory.com

1    someone saying, "The heck with it.  I'm not going to appear."

2         You also face state charges, and you faced them then,

3    but they're becoming imminent now.  And the fear of some state

4    judge imposing a sentence that could be on top of or consecutive

5    to the sentence that I impose could be a factor in someone

6    fleeing.

7         Third, in my evaluation of this case, $53.7 million has

8    been stolen.  Ten million dollars have been recovered.  And even

9    if you double that depreciation on the assets from their

10   purchase date, it still is -- and considering your lavish

11   lifestyle, it still is not inconceivable that someone with your

12   ability to do what you've done to forge records, to have a

13   secret bank account, that you could have some assets somewhere,

14   and it could be inferred from that that if all looks bleak that

15   you could find those assets and flee.

16        Finally -- so, that all gives me a conclusion that

17   there is a likelihood that you could flee.  One other factor,

18   very minor, but there are a lot of people who sent letters to me

19   that you and your lawyer have seen, letters from people of Dixon

20   that may not have thought that you would see these.  There

21   could -- there could.  I doubt it, but there could be

22   retaliation in some way if you were allowed to remain out on

23   bond.

24        For all those reasons, I find that the defendant has

25   not met the burden and to provide me of clear and convincing

1   evidence to those two statutory factors, and I'm going to revoke

2   the bond and have you placed into custody.

3            I always say something to every defendant that I

4   sentence.  You're going to be going away for a long period of

5   time.  It's only -- you have everything in your own hands from

6   now on out.  You'll be under the control of the Bureau of

7   Prisons, but they have programs.  They have ministry.  They have

8   a lot of other positive things that you can do to occupy your

9   time, to maybe repent for what you've done, and you'll have the

10  support of some people who have written these letters to me that

11  they can contact you, visit you.  All should not be despaired at

12  this time by you.

13           That's all.  Good luck.

14      (Which were all the proceedings had in the above-entitled

15       cause on the day and date aforesaid.)

16      I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19

20  Mary T. Lindbloom
    Official Court Reporter

21

22

23

24

25